Raymond FEIFER, Nicholas Pocchia, and Edwin Molina, Plaintiffs–Appellants,

v.

PRUDENTIAL INSURANCE COMPANY OF AMERICA, Daily News, L.P., and Daily News, L.P. Benefits Program, Defendants–Appellees.

Docket Nos. 99–9451, 00–9568.

United States Court of Appeals, Second Circuit.

Argued: Oct. 23, 2001.

Decided: Oct. 7, 2002.

Jeffrey L. Kreisberg, Kreisberg, Maitland & Thornhill, LLP, New York, NY, for Plaintiffs–Appellants.

Edward D. Greenberg, Schwartz & Greenberg, New York, NY, for Defendant–Appellee Prudential Insurance Company of America.

David E. McCraw, Deputy General Counsel, Daily News, L.P., New York, NY, for Defendants–Appellees Daily News, L.P. and Daily News, L.P. Benefits Program.

Before CARDAMONE, WINTER, and SACK, Circuit Judges.

SACK, Circuit Judge.

Plaintiffs Raymond Feifer, Nicholas Pocchia, and Edwin Molina, former employees of the defendant Daily News, L.P. ("DNLP"), appeal from a judgment of the United States District Court for the Eastern District of New York (I. Leo Glasser, *Judge*) denying their motions for summary judgment, granting the defendants' motions for summary judgment on their counterclaims, and granting the motion of defendant Prudential Insurance Company of America ("Prudential") for a declaratory judgment. The plaintiffs seek enforcement under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA"), of the terms of a document that DNLP distributed to its employees but now claims does not constitute an employee benefits plan pursuant to ERISA. We reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

## BACKGROUND

### The Facts

The facts underlying this appeal, largely undisputed, are set forth in detail by the district court in its thoughtful opinion disposing of the motions for summary judgment. *See Pocchia v. Prudential Ins. Co.,* 74 F.Supp.2d 240, 242–46 (E.D.N.Y.1999). They are rehearsed here only insofar as is necessary to explain our resolution of this appeal.

In 1991, after a strike by its delivery drivers, the New York Daily News and its associated businesses (the "Daily News") were acquired by Maxwell Newspapers, Inc. ("Maxwell"). By late 1992, the newspaper was foundering. At that time, Mortimer Zuckerman, then a principal of U.S. News & World Report, L.P., caused DNLP to be formed for the purpose of buying the Daily News. Zuckerman also became a DNLP principal. In late 1992 or early 1993, DNLP bought the Daily News from Maxwell.

One task confronting DNLP in the course of this acquisition was instituting a benefit plan to cover former Maxwell employees whose services were sought for the continued publication of the newspaper. The plaintiffs were among those employees.

DNLP's written agreement to purchase the Daily News expressed DNLP's intention to institute benefit plans for non-union ("exempt") Daily News workers similar to those provided by U.S. News & World

Report, L.P. to its employees. But on January 18, 1993, DNLP issued a memorandum to its new employees announcing that a new benefits plan would be in effect as of February 1, 1993, without reference to the U.S. News & World Report plan. Attached to that memorandum was a twenty-one-page booklet entitled "Daily News, L.P. Benefits Program Summary" (the "Program Summary"), which summarized DNLP benefits, including medical insurance, life and accidental death and dismemberment insurance, in addition to vacation and holiday policies. Two pages of the Program Summary described disability benefits. One of the five paragraphs in the section entitled "Short-term Disability" read: "Short-term disability benefits will be offset by any payments for which you are eligible under the State Disability Benefits Law or the Workers' Compensation law." The three-paragraph section entitled "LONG TERM DISABILITY," which immediately followed, contained no analogous provision. Both the short-term and long-term disability benefits were stated to be 60 % of weekly base salary, a reduction from the 66⅔ % of weekly salary that had been provided by the Maxwell plan.

Several of the Program Summary pages, but not the two discussing disability benefits, contained the following disclaimer, printed in small, bold type:

> This summary is for informational purposes only and is not intended to cover all details of the Plan. The actual provisions of the Plan will govern in settling any questions that may arise.

There is no indication in the record, however, that, at that time, DNLP or its employees possessed a written document describing benefits under "the Plan" other than the Program Summary and the accompanying memorandum.[1] And although the plaintiffs continued to work for DNLP after the acquisition, they received no further written communications from DNLP regarding disability benefits during the course of their employment.

At or before the time DNLP distributed the Program Summary to its employees, it began making premium payments to Prudential to cover benefits for its employees. Nothing in the record suggests, however, that it informed its employees in general, or the plaintiffs in particular, of that fact.

On September 30, 1993, DNLP's insurance broker sent DNLP a draft "Benefit Booklet" describing in detail benefits for DNLP employees. Unlike the Program Summary, the draft Benefit Booklet specified that long-term disability benefits were subject to an offset for Social Security disability and workers' compensation payments received by employees. Neither DNLP nor Prudential distributed the draft Benefit Booklet to DNLP employees in general, or to the plaintiffs in particular. DNLP and Prudential exchanged several revised versions of the Benefit Booklet over the next few years. They did not, however, execute a benefits plan agreement—what they were to call the "Group Contract"—until July 1997, some four and one-half years after the DNLP acquisition. The Group Contract incorporated a version of the Benefit Booklet, which, like previous versions but unlike the Program Summary, specified that long-term disability benefits are subject to Social Security and workers' compensation offsets.

---

1. The record contains an internal communication between Prudential employees, dated December 2, 1992, apparently indicating the terms on which Prudential would offer a plan to DNLP, which includes the notation "S.S. offset," presumably referring to Social Security payments. But there is no indication or assertion by either defendant that this document was sent to or seen by anyone outside of Prudential.

In August 1993, some seven months after the Program Summary had been distributed and about one month before DNLP first received a draft Benefit Booklet, plaintiff Nicholas Pocchia became disabled as a result of a work-related accident. He promptly applied for and began to receive short-term disability benefits that were reduced by the amount of his workers' compensation payments in accordance with the terms of the Program Summary. After six months, Pocchia also applied for and began to receive long-term disability benefits. At the same time, Pocchia applied for and began to receive Social Security Disability Insurance payments. In October 1995, more than two and one-half years after the Program Summary had been distributed and more than two years after he had become disabled, Pocchia received a letter from Prudential indicating that his long-term benefits were subject to a Social Security offset. The letter included a form, a so-called reimbursement agreement, for Pocchia's signature. Although the reimbursement agreement does not appear in the record, the parties agree that it was similar if not identical to the reimbursement agreement received by plaintiff Raymond Feifer, which contained the following language:

> I understand that the Policy requires that my [long-term disability] benefits for any month or partial month as [sic] reduced by Workers' Compensation and any benefits received under the Social Security Act that I or members of my family receive, or would be entitled to receive as a result of my disability, for that same monthly period.

The agreement also provided that the disabled employee promised to reimburse Prudential if his Social Security benefits were awarded retroactively for a period during which the employee was receiving long-term benefits without offsets. Pocchia did not sign the agreement. Prudential therefore reduced Pocchia's disability benefits by Prudential's estimate of Pocchia's monthly Social Security payments.

Feifer also took disability leave in August 1993. He too applied for and obtained short-term, and then long-term, disability benefits. Feifer also received a letter and reimbursement agreement like those received by Pocchia and containing the above-quoted language. Feifer asserts that, in response, he telephoned Prudential, and was told that he was required to sign the reimbursement agreement to receive benefits. The defendants aver that Feifer would have been told only that if he did not sign the reimbursement agreement, Social Security offsets would have been made on the basis of estimates, as they were in Pocchia's case. Feifer executed the agreement and returned it to Prudential. He thereafter received long-term disability benefits from Prudential offset by the amount of the actual Social Security payments made to him.

At some point in 1993 or 1994, plaintiff Edwin Molina also became injured and also progressed from short-term to long-term disability. In May 1994, Prudential sent Molina a letter and reimbursement agreement like those it sent Feifer and Pocchia. Molina asserts that upon receiving the reimbursement agreement he telephoned Prudential and was told that his long-term disability benefits would be reduced by any Social Security payments he received. Molina further asserts that the representative also told him that he would receive no benefits if he did not sign the reimbursement agreement. Like Feifer, but unlike Pocchia, Molina signed and submitted the reimbursement agreement, and subsequently received long-term disability benefits reduced by the amount of his actual Social Security payments rather than the estimated payments.

*The Litigation*

In 1996, Pocchia and Molina filed a state-court action relating to these events, which the defendants removed to the United States District Court for the Eastern District of New York. Feifer's similar action, filed against the same defendants in the district court in January 1998, was consolidated with that of Pocchia and Molina. The three plaintiffs alleged that their rights under ERISA were violated when the defendants reduced, or sought to reduce, the plaintiffs' long-term disability benefits by the amounts of their Social Security payments, and, in Pocchia's case, his workers' compensation payments. The defendants asserted in their answers that the Social Security and workers' compensation offsets were binding on the plaintiffs under the terms of the Group Contract, executed in 1997 by DNLP and Prudential. The defendants also counterclaimed against Molina and Pocchia for alleged overpayments of disability benefits disbursed before their offsets were calculated.[2] In support of their counterclaims against Molina, the defendants argued that he was obligated, under the terms of the reimbursement agreement he signed, to return long-term disability overpayments. No such argument was made with regard to Pocchia, who had declined to execute a reimbursement agreement. All parties then moved for summary judgment, and Prudential moved for a declaratory judgment to the effect that its reduction of the plaintiffs' benefits was proper, and for an award of costs and attorney's fees pursuant to 29 U.S.C. § 1132(g).

On November 5, 1999, the district court issued a decision denying the plaintiffs' motions for summary judgment; granting the defendants' motions for summary judgment; granting Prudential's motion for a declaratory judgment to the extent of the district court's holdings in its memorandum opinion; and denying Prudential's motion for an award of costs and fees. *Pocchia*, 74 F.Supp.2d at 242. The district court held that the terms of the Program Summary and the Group Contract regarding long-term disability benefits did not conflict, and thus that the plaintiffs were bound by the offset provision in the Group Contract. *Id.* at 246–49. In the alternative, the district court rejected the plaintiffs' claims because they were unable to show detrimental reliance upon, or prejudice resulting from the existence of, the Program Summary. *Id.* at 249–50. The district court granted the defendants' motion for summary judgment on their counterclaim against Pocchia because it concluded that Prudential had underestimated the amount of Pocchia's Social Security payments and thus overpaid him. *Id.* at 250. The district court also granted summary judgment to the defendants on their counterclaim against Molina based on his failure to abide by the terms of the reimbursement agreement, in which he promised to return to Prudential any overpayment of benefits resulting from a miscalculation of his Social Security payments. *Id.* at 251. In so holding, the district court rejected Molina's argument that he had signed the reimbursement agreement under economic duress and thus is not bound by its terms. *Id.* at 251–52. Finally, the district court denied Prudential's motion for an award of costs and attorneys' fees, finding that the plaintiffs did not bring their actions in bad faith. *Id.* at 253.

The plaintiffs appeal.[3]

---

2. No counterclaim was made against Feifer because he had reimbursed Prudential for the offset amount. *Pocchia,* 74 F.Supp.2d at 242 n. 1, 252.

3. Prudential does not cross-appeal the district court's denial of its motion for an award of costs and fees.

## DISCUSSION

### I.  Standard of Review

■ We review a district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir.1999), *cert. denied*, 529 U.S. 1098, 120 S.Ct. 1832, 146 L.Ed.2d 776 (2000). A district court must grant a motion for summary judgment if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c), i.e., "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A fact is "material" for these purposes if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### II.  Identifying the Plan

The plaintiffs pled their claims under 29 U.S.C. § 1132(a)(1)(B), which provides a right of action for employees to recover benefits to which they are entitled under the terms of an employee benefits plan.[4] To adjudicate such a claim, a court necessarily must identify the "terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

The plaintiffs seek enforcement of the terms of the Program Summary, which does not explicitly provide for Social Security or workers' compensation offsets for long-term disability benefits. For purposes of analysis, the district court treated the Program Summary, distributed in January 1993, as a flawed summary plan description, or "SPD," *see* 29 U.S.C. §§ 1021(a)(1) & 1022, and treated the Group Contract, executed in 1997, as "the plan" that the Program Summary described. *Pocchia*, 74 F.Supp.2d at 246–50.

■ We conclude that, at least with respect to the period between January and late September 1993, the district court's analysis is foreclosed by the language of ERISA. In a section of the statute entitled "Establishment of Plan," ERISA provides that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). We have interpreted this section as establishing that "ERISA was designed to 'ensure[ ] that plans be governed by written documents.'" *Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d 72, 77–78 (2d Cir.1996) (quoting *Moore v. Metro. Life Ins. Co.*, 856 F.2d 488, 492 (2d Cir.1988)). This written instrument requirement is central to our analysis of ERISA plans because it "serves two of the primary goals of ERISA: informing employees of the benefits to which they are entitled, and providing some degree of certainty in the administration of benefits." *Wentworth v. Digital Equip. Corp.*, 933 F.Supp. 123, 127 (D.N.H.1996). As we have noted, the Program Summary is the only document in the record that existed between January and September 30, 1993, and that described employee benefits. We do not think that an employer can avoid the written instrument requirement by treating this written document describing employee benefits as merely a summary of a plan that is nowhere else in writing.

---

4. "A civil action may be brought ... (1) by a participant or beneficiary ... (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132.

Besides meeting the written instrument requirement, the Program Summary plainly meets the definition of a "plan" under ERISA. The statute defines "employee welfare benefit plan" as:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer ... to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries ... [*inter alia*] disability ... benefits.

29 U.S.C. § 1002(1). The Supreme Court has indicated that the term "plan" in the statute means nothing more than "a scheme decided upon in advance." *Pegram v. Herdrich,* 530 U.S. 211, 223, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000). And we have held that a " 'plan, fund, or program' under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Grimo v. Blue Cross/Blue Shield of Vt.,* 34 F.3d 148, 151 (2d Cir. 1994) (citation omitted; alteration in original); *accord Pegram,* 530 U.S. at 223, 120 S.Ct. 2143 ("Rules governing collection of premiums, definition of benefits, submission of claims, and resolution of disagreements over entitlement to services are the sorts of provisions that constitute a plan.").

However slap-dash, the Program Summary and the accompanying memorandum fulfill these requirements. They describe "a scheme decided upon in advance" to provide employee benefits. They set forth, albeit in outline form, the benefits to be provided. The memorandum states the class of beneficiaries: "All Exempt [i.e., non-union] Employees." Both the memorandum and the Program Summary identify the ultimate source of financing for the plan benefits: DNLP. The documents are replete with instructions for obtaining benefits. For instance, one of the twenty-one pages of the Program Summary is given over entirely to "Procedures for Sick Pay/Short Term Disability." And the documents existed during a time when DNLP was paying premiums to Prudential to cover employee benefits, which establishes DNLP's intent to "provid[e,] for ... participants or their beneficiaries[,] benefits." 29 U.S.C. § 1002(1).

Although the Program Summary contains the disclaimer that it was "not intended to cover all details of the Plan" and that the "actual provisions of the Plan will govern," we reject the notion that this disclaimer renders the Program Summary a non-plan during the period when it was the only written document describing benefits. We held in *Heidgerd v. Olin Corp.* that "[i]t is of no effect to publish and distribute a plan summary booklet ... and then proclaim that any inconsistencies will be governed by the plan." 906 F.2d 903, 908 (2d Cir.1990) (quoting *McKnight v. Southern Life & Health Ins. Co.,* 758 F.2d 1566, 1570 (11th Cir.1985)). This is especially true where the "plan" allegedly summarized by the document distributed to employees does not otherwise exist in written form at the time of distribution. Crediting such a disclaimer in this situation would allow an employer effectively to "opt out" of ERISA's requirements despite its establishment of an employee benefits scheme that meets ERISA's definition of a "plan." But ERISA's requirements are not optional; Congress intended through ERISA to establish "a *comprehensive* system for the federal regulation of private employee benefit plans." *Dist. of Columbia v. Greater Wash. Bd. of Trade,* 506 U.S. 125, 127, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992) (emphasis added). Also, because an employer could always produce a subsequent document without such a dis-

claimer, crediting the disclaimer in this situation would allow an employer effectively to use such a subsequent document to make post-hoc changes in plan terms without complying with the plan amendment procedures that employers must specify under 29 U.S.C. § 1102(b)(3).[5]

We conclude that, at least during the period between January and September 30, 1993, when the first draft Benefit Booklet was received by DNLP, the Program Summary and its accompanying memorandum were "the plan" for purposes of the plaintiffs' actions under § 1132(a)(1)(B).

### III. Interpreting the Plan

■ A claim under § 1132(a)(1)(B), "in essence, is the assertion of a contractual right." *Strom v. Goldman, Sachs & Co.*, 202 F.3d 138, 142 (2d Cir.1999); *accord Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 82 (2d Cir.2001). In interpreting plan terms for purposes of claims under § 1132(a)(1)(B), we apply a federal common law of contract, informed both by general principles of contract law and by ERISA's purposes as manifested in its specific provisions. *See Devlin*, 274 F.3d at 84 n. 5 ("[I]n ERISA cases, state law does not control. Instead, general common law principles apply."); *Schonholz*, 87 F.3d at 79 ("ERISA is a federal law regime for regulating employee benefits designed to eliminate the threat of conflicting state and local regulation of benefit plans.").

#### A. The Initial Promised Benefits

■ With these considerations in mind, we turn to the language of the Program Summary. It is axiomatic that where the language of a contract is unambiguous, the parties' intent is determined within the four corners of the contract, without reference to external evidence. *United States v. Liranzo*, 944 F.2d 73, 77 (2d Cir.1991). And the language of the Program Summary manifests a plain and unambiguous intent to provide long-term disability benefits without offsets for Social Security or workers' compensation payment. Not only does the document describe long-term disability benefits without mentioning such offsets, its explicit mention of offsets for short-term benefits creates the impression that this silence was intentional. Therefore, at least for the period between January and September 30, 1993, we decline to look for outside evidence of plan terms. *See, e.g., W.W.W. Assoc., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 642, 565 N.Y.S.2d 440, 443 (1990) ("Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing.").

■ Although the Program Summary contains the disclaimer set forth above, we reject the notion that such disclaimers introduce ambiguity into otherwise unambiguous plan documents requiring reference to extrinsic evidence. Having promulgated such a document, while it is in effect, defendants cannot avoid their responsibilities under it. We thus agree with the Third Circuit that 29 U.S.C. § 1102(a)(1), which contains ERISA's written instrument requirement, "essentially operates as a strong integration clause, statutorily inserted in every plan document," *Senior Executive Benefit Plan Participants v. New Valley Corp.*, 89 F.3d 143, 149 (3rd Cir.1996), *cert. denied*, 519 U.S. 1110, 117 S.Ct. 947, 136 L.Ed.2d 835 (1997). And we decline to allow an employer to override this implicit integration clause with a ref-

---

**5.** "Every employee benefit plan shall—(3) provide a procedure for amending such plan, and for identifying the persons who have au- thority to amend the plan ...." 29 U.S.C. § 1102(b)(3).

erence to terms that do not then exist in written form.

We conclude that, for at least the period between the circulation of the Program Summary in early 1993 and September 30, 1993, the terms of the plan for purposes of the plaintiffs' claims provided for long-term disability benefits without Social Security or workers' compensation payment offsets.

## B. The Question of Vesting

Because the draft Benefit Booklet contains terms that potentially conflict with those of the Program Summary, we must address the additional question of "vesting." Under the principle that an employee benefit plan is effectively a unilateral contract, a benefit becomes "vested" if the employer has promised not to amend or terminate it, and the employee has accepted this offer by beginning or continuing in employment.

> Where the offeror [does] not explicitly reserve the power to revoke, such an offer cannot be revoked once the offeree has begun to perform. "The beginning of performance ... completes the manifestation of mutual assent and furnishes consideration."

Devlin, 274 F.3d at 84 (quoting Restatement (Second) of Contracts § 45(1) cmt. d (1981) (internal citation and punctuation omitted; alteration in original)); accord Kemmerer v. ICI Americas Inc., 70 F.3d 281, 287 (3d Cir.1995) (holding that "[s]ubsequent unilateral adoption of an amendment which is then used to defeat or diminish the [employee's] fully vested rights under the governing plan document is ... ineffective" (internal quotation marks and punctuation omitted; alteration in original)), cert. denied, 517 U.S. 1209, 116 S.Ct. 1826, 134 L.Ed.2d 931 (1996). Thus, if the Program Summary promised rights that would vest before the introduction of later documents purporting to describe different plan terms, then these later documents cannot diminish those rights with regard to these plaintiffs, who accepted the DNLP offer contained in the plan by continuing in the employ of DNLP after it was promulgated.

The questions whether and when benefits vest are matters of contractual interpretation. Devlin, 274 F.3d at 82; Schonholz, 87 F.3d at 77–78. If a plan is unambiguous regarding the employer's intent to promise a vested benefit, that promise is enforced. Am. Fed'n of Grain Millers v. Int'l Multifoods Corp., 116 F.3d 976, 980 (2d Cir.1997). Our review of the Program Summary and its accompanying memorandum, however, reveals no explicit language that either promises vested disability benefits or reserves DNLP's right to amend or revoke such benefits.

Other circuits are divided on the question whether silence in a plan document regarding vesting should be interpreted as implying a promise to provide vested benefits. See id. (collecting cases). We have not yet confronted this issue with regard to a plan document promising disability benefits. For plans promising other types of benefits, however, we have held that the vesting question cannot be determined as a matter of law where a plan is not explicit one way or the other. For example, in the case of severance benefits, we have held that the question of vesting is for the trier of fact, so long as the plaintiff can "point to written language capable of reasonably being interpreted as creating a promise on the part of [the employer] to vest ... benefits." Schonholz, 87 F.3d at 78. And we have held that this same standard applies in the context of retiree health insurance benefits, see Joyce v. Curtiss–Wright Corp., 171 F.3d 130, 134 (2d Cir.1999), and life insurance benefits, see Devlin, 274 F.3d at 83.

When, on September 30, 1993, Prudential sent DNLP a draft Benefit Booklet that, unlike the Program Summary, explicitly provided for Social Security and workers' compensation offsets for long-term disability benefits, Pocchia and Feifer had already become disabled. The vesting question with regard to these plaintiffs, then, is whether DNLP promised disability benefits that it would not be able to alter or revoke after an employee became disabled. Because of the particular circumstances regarding disability benefits, and in light of the rule in this Circuit that an otherwise ambiguous plan "should be construed against the interests of the party that drafted the language," *Perreca v. Gluck*, 295 F.3d 215, 223 (2d Cir.2002), we conclude as a matter of law that, absent explicit language to the contrary, a plan document providing for disability benefits promises that these benefits vest with respect to an employee no later than the time that the employee becomes disabled.

As indicated above, the theory of a unilateral contract of the sort represented by the Program Summary is that the document containing the contract's terms is an offer that is accepted by the employee's commencing or continuing to work for the offeror. If the employee does not like the terms, he or she can decline and seek better terms elsewhere. But this choice is one that an employee, once disabled, cannot make. Nor does a disabled employee generally enjoy the retiree's advantage of being able to select, or at least predict, his or her date of separation from the company, and plan accordingly. If the DNLP plan did not vest with respect to the amount of long-term disability payments even after the plaintiffs became disabled, and DNLP could therefore reduce the amount of those payments by changing the plan to institute the offsets, then DNLP could also have amended the plan to reduce payments by, say, fifty percent, or simply to withdraw them. Despite the severe impact any such change would have on employees like the plaintiffs, their very disabilities would likely leave them with no alternative place to seek employment income. The nature of this benefit strongly suggests, then, that the parties did not intend or expect that DNLP could unilaterally change the terms of long— or short—term disability benefits after the date of disability absent an explicit provision to that effect. *See Taylor v. Cont'l Group Change in Control Severance Pay Plan*, 933 F.2d 1227, 1232–33 (3d Cir.1991) (intent of employer as well as reasonable expectations of employees relevant in determining the terms of a unilateral benefits contract).

We therefore conclude that DNLP's plan between January and at least September 30, 1993, provided for long-term disability benefits without Social Security or workers' compensation offsets that were vested with respect to a particular employee at the latest when the employee became disabled. Thus Pocchia and Feifer, under the terms of the plan, were entitled to long-term disability benefits without such offsets. DNLP could not unilaterally diminish those benefits by issuing later documents purporting to describe plan terms.

Whether this analysis also applies to Molina is a question we cannot decide on appeal because the record does not establish when Molina became disabled. In his complaint, Molina alleges that he became disabled "in or about 1994," but he subsequently signed an affidavit stating that he became disabled in 1993. If Molina became disabled before September 30, 1993, the earliest date that the defendants can establish for DNLP's possession of the Benefit Booklet, then the plan terms we identified for the claims of Pocchia and Feifer apply to his claim as well.

If, however, Molina became disabled after DNLP received the Benefit Booklet,

then a different analysis may be required. For Molina, the district court may need to consider whether the disability benefits promised in the Program Summary vest even before an employee becomes disabled, and, if not, whether DNLP through the draft Benefit Booklet, which was not disseminated to employees, or otherwise, effectively amended the terms of the plan to require the offsets before Molina became disabled. Because the district court may not need to resolve these questions, we do not address them further here.

IV. Reliance and Prejudice

The defendants argue in the alternative that the plaintiffs may not enforce the terms of the Program Summary without a showing of detrimental reliance upon, or prejudice by, that document. Unlike most other circuits, this Court has not yet decided whether a showing of these factors is ever necessary for a plaintiff to succeed in an action brought under ERISA. *See Layaou v. Xerox Corp.*, 238 F.3d 205, 212 (2d Cir.2001) (collecting cases); *Heidgerd*, 906 F.2d at 909. We note, however, that those courts that have imposed requirements such as reliance or prejudice did so only where plaintiffs sought to enforce provisions other than those that the court deemed "plan" terms. *See Andersen v. Chrysler Corp.*, 99 F.3d 846, 858 (7th Cir. 1996); *Aiken v. Policy Mgmt. Sys. Corp.*, 13 F.3d 138, 139 (4th Cir.1993); *Branch v. G. Bernd Co.*, 955 F.2d 1574, 1579 (11th Cir.1992); *Gridley v. Cleveland Pneumatic Co.*, 924 F.2d 1310, 1318 (3d Cir.), *cert. denied*, 501 U.S. 1232, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991); *Anderson v. Alpha Portland Indus., Inc.*, 836 F.2d 1512, 1519–20 (8th Cir.1988), *cert. denied*, 489 U.S. 1051, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989); *Govoni v. Bricklayers, Masons & Plasterers Int'l Union*, 732 F.2d 250, 252 (1st Cir.1984). To put it another way, we are unaware of caselaw to the effect that a plaintiff must show reliance or prejudice to enforce terms of a plan. Such a limitation on the reliance or prejudice requirement is consistent with the principle that an action under ERISA to enforce plan terms sounds in contract, and a plaintiff generally need not show equitable factors such as reliance or prejudice to enforce contractual terms. We therefore conclude that a plaintiff need not show reliance, prejudice, or any other equitable factor to enforce plan terms in a claim under § 1132(a)(1)(B).

The defendants seek to characterize the Program Summary as an SPD, albeit one that does not meet the requirements for SPDs set forth in 29 U.S.C. § 1022(b). And the district court, treating the Program Summary as a flawed SPD, held that "even if the [Program Summary] were adjudged inconsistent with the Group Contract, plaintiffs would still have to show that they either relied to their detriment on the allegedly inconsistent provisions, or were otherwise prejudiced by those provisions." *Pocchia*, 74 F.Supp.2d at 249. But we have concluded in Part II above, that the Program Summary (with the accompanying memorandum) *was* the plan, at least until September 30, 1993. Because Feifer and Pocchia seek to enforce plan terms, not the terms of another document in conflict with the plan, there is no need for a showing of reliance or prejudice for them to establish their claims.

In contrast, if the district court were to find on remand that the terms of the Benefit Booklet, the Group Contract, or some other document were the terms of the plan for purposes of Molina's claim, and that the Program Summary conflicts with those terms, the court might again consider whether Molina must show reliance or prejudice to prevail. We note that, in that instance, Molina would find his cause of action not in § 1132(a)(1)(B), but rather in § 1132(a)(3), which allows a plan participant to sue for "equitable relief" for "any

act or practice" that violates ERISA's various requirements. Because the issue may not arise in light of, among other things, the factual uncertainty regarding the date of Molina's disability and the possible effect of the reimbursement agreement, we decline to reach it at this time.[6]

## V. The Reimbursement Agreements

Both Molina and Feifer signed reimbursement agreements in which they agreed that under the terms of the "Policy," long-term disability benefits would be reduced by any Social Security or workers' compensation payments they received. The district court concluded that the plaintiffs have no basis for recovery under DNLP's plan or in equity, and thus considered the reimbursement agreements only in the context of alleged overpayments the plaintiffs received before their Social Security offsets were assessed. *Pocchia,* 74 F.Supp.2d at 251–52. The district court had no occasion to consider the significance of the reimbursement agreements if Feifer and Molina, who signed them, have otherwise viable claims for long-term disability benefits without offsets under the terms of the DNLP plan. On remand, the district court may be required to consider this question for the first time, taking into account the procedural availability of any arguments raised at that point by the parties.

## VI. Insurer Liability for SPDs

Prudential finally argues that it cannot be held liable for the DNLP's failure to comply with ERISA's requirement that plan administrators distribute SPDs. *See* 29 U.S.C. §§ 1021 & 1022. As we have

indicated, at least Pocchia and Feifer's claims arise under 29 U.S.C. § 1132(a)(1)(B), as actions to recover benefits to which they are entitled under plan terms, and not under § 1132(a)(3), to redress violations of ERISA's requirements. We thus reject Prudential's argument with regard to these two plaintiffs because the relative responsibility of the defendants for potential statutory violations is irrelevant in light of the nature of their claims. We do not reach the question of Prudential's liability with regard to Molina's claim. The district court may consider it for the first time, if necessary, on remand.

## CONCLUSION

For the foregoing reasons, the district court's judgment is vacated, and the case is remanded for further proceedings consistent with this opinion.

---

**6.** Nothing we say here is intended to imply that an employee seeking to recover on the basis of non-plan terms need not meet other requirements established by our previous decisions. *See, e.g., Heidgerd,* 906 F.2d at 908 (to recover on the basis of language in plan summary, a plaintiff must show that the terms in the plan and the plan summary "conflict"); *Moore,* 856 F.2d at 492 (employees may not enforce terms in informal documents that might conflict with terms in formal documents filed under ERISA's reporting requirements).