**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

———————————————————

TRACY O. and DANTE O., individually
and as guardians of S.O., a minor,

     Plaintiffs–Appellants,

v.

ANTHEM BLUE CROSS LIFE AND
HEALTH INSURANCE; ANTHEM UM
SERVICES, INC.,

     Defendant–Appellee.

No. 17-4135
(No. 2:16-CV-00422-DB)
(D. Utah)

———————————————————

**ORDER AND JUDGMENT**[*]
———————————————————

Before **BRISCOE**, **BALDOCK**, and **EID**, Circuit Judges.
———————————————————

Appellants Dante O. and Tracy O. were enrolled in a health benefits plan

insured by Appellees Anthem Blue Cross Life and Health Insurance Company and

administered by Anthem UM Services, Inc. (together, Anthem). The plan[1] only

covered psychiatric treatment that Anthem determined to be "medically necessary."

Dante O. and Tracy O. sent their daughter, S.O., to a residential psychiatric treatment

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] As explained more in-depth in Section II.A, we consider "the plan" to be
both the Combined Evidence of Coverage and Disclosure form and the Group Benefit
Agreement documents presented in the administrative record.

center for ten months to address her significant mental health problems. Anthem determined that residential psychiatric treatment was not medically necessary for S.O. and denied coverage. After exhausting administrative remedies, Dante O. and Tracy O. sued Anthem. The district court granted summary judgment to Anthem, holding that the adverse health benefits decision passed muster under either an arbitrary and capricious or de novo review.

The language of the plan provides that "**THE BENEFITS OF THIS PLAN ARE PROVIDED ONLY FOR THOSE SERVICES THAT WE DETERMINE TO BE MEDICALLY NECESSARY**." Our court's reasoning in *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1131 (10th Cir. 2011), dictates that a health benefits plan "grants discretion to the plan administrator in reviewing benefits claims" when the "plan language" gives discretionary authority to a plan administrator. *See, e.g.*, *id.* at 1132 (entrusting the "medically necessary" determination to the administrator). We conclude the plan in this case gives such discretion to Anthem, and that its decision to deny residential coverage stands unless it is arbitrary and capricious. We conclude that such a showing has not been made, and thus affirm the district court's judgment.

## I.

Dante O.'s employer, California Commerce Club, Inc., provided a fully-insured employee group health benefits plan governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461. Anthem Blue Cross is the insurer of the plan, and Anthem UM Services, Inc. handles plan claims and appeals.

2

The two plan documents that have been produced are the Combined Evidence of

Coverage and Disclosure form (Evidence of Coverage form) and the Group Benefit

Agreement.  *See* App. 182 (Order at 5); *see also id.* at 191 n.6 (Order at 14 n.6).[2]

According to those documents, Anthem will pay for psychiatric treatment that is

"medically necessary," *id.* at 182 (Order at 5), and Anthem makes the determination

of medical necessity.  Indeed, under the Evidence of Coverage form, "**THE**

**BENEFITS OF THIS PLAN ARE PROVIDED ONLY FOR THOSE SERVICES**

**THAT WE DETERMINE TO BE MEDICALLY NECESSARY**." *Id*.

Residential psychiatric treatment—treatment at a "24 hours per day" facility

with at least one doctor visit per week, *id.* at 183 n.3 (Order at 6 n.3)—qualifies for

coverage under the plan if three criteria are met:

1. The Covered Individual is manifesting symptoms and behaviors which represent a deterioration from their [sic] usual status and include either self injurious or risk taking behaviors that risk serious harm and cannot be managed outside of a 24 hour structured setting.
2. The social environment is characterized by temporary stressors or limitations that would undermine treatment that could potentially be improved with treatment while the Covered Individual is in the residential facility.
3. There should be a reasonable expectation that the illness, condition or level of functioning will be stabilized and improved and that a short term, subacute residential treatment service will have a likely benefit

---

[2] The parties initially designated a significant portion of the appendix be sealed for the protection of sensitive medical information.  Upon order of this court, the parties agreed to unseal all documents that did not contain personal health information or had been previously discussed by the parties in their briefing or by the district court. The parties have also agreed to file a redacted version of the Group Benefit Agreement. We therefore do not cite to, or quote, anything here that is not contained in the now-unsealed portions of the appendix or quoted by the parties in their unsealed briefing or the district court in its opinion below.

> on the behaviors/symptoms that required this level of care, and that the Covered Individual will be able to return to outpatient treatment.

*Id.* at 183 (Order at 6).

After years of medical issues, including diagnoses of generalized anxiety disorder, major depressive disorder, borderline personality tendencies, bulimia nervosa, obsessive-compulsive disorder, and autism spectrum disorder, S.O. was admitted to New Haven Residential Treatment Center in Utah. *Id.* at 181 (Order at 4). S.O. lived at New Haven for ten months. Aple. Br. at 19. Early in her time at New Haven, Dr. Rick Biesinger psychologically evaluated S.O., stating that at the time she "denied having any suicidal ideation." App. 181 (Order at 4). S.O. initially told Dr. Biesinger she cut herself once a day, but eventually explained the last time she did so was "two months ago." *Id.*

A few days after S.O.'s admission to New Haven, Dante O. and Tracy O. asked Anthem to certify that S.O.'s care was covered by the plan by seeking a pre-authorization. Dr. Richard Cottrell, a psychiatrist, determined that S.O. did not meet the requisite criteria for residential treatment but could be treated at an outpatient facility. *Id.* at 185 (Order at 8). Anthem denied coverage because it determined that the service was not "medically necessary" based on the information Anthem had received from the service provider and the recommendation of Anthem's evaluating physician, Dr. Timothy Jack. *Id.* at 184 (Order at 7). Anthem's medical reviewer, Dr. Marina Bussel, echoing Dr. Cottrell, explained: "You went to this program because your behavior could be harmful to yourself or others. You have not caused serious harm to anyone. You have not harmed yourself to such a degree that has

4

caused serious medical problems. You have not had recent treatment for this in a structured outpatient program. You are also likely to benefit from structured outpatient treatment." *Id.* at 185 (Order at 8).

Dante O. and Tracy O. appealed Anthem's denial of coverage. To substantiate the medical necessity of S.O.'s treatment at New Haven, Dante O. and Tracy O. submitted a letter by Dr. Linda Woodall, S.O.'s treating psychiatrist. Aplt. Br. at 20. The letter reads, in part:

> [S.O.] had had a previous psychiatrist at age 6 years old for lability and OCD. As her disorder progressed, however, she began to have clear psychotic symptoms with and without severe mood swings. She exhibited dangerous behavior: binge eating, purging, restricted eating, severe weight loss, cutting, and hypersexuality. . . . Unfortunately, she became frankly psychotic by 3/24/11, with suicidal ideation . . . This is clearly a very disturbed young woman who has been difficult to manage, both medically and behaviorally, with traditional care. Her Schizoaffective disorder, bipolar type, dangerous behavior, and eating disorder warrant long-term residential treatment.

*Id.* at 20–21. Dante O. and Tracy O. also submitted a letter by S.O.'s therapist, Carol Maskin, who stated that S.O. "had too many triggers in her environment to be able to use the tools she learned in therapy. . . . [S]he was extremely symptomatic and on a daily basis there was concern for her safety. . . . based upon my experience of working with adolescents, it was clear to me that [S.O.] would only get worse or even succeed at suicide." *Id.* at 21.

Dr. Donald Mayes, an Anthem doctor, reviewed S.O.'s coverage eligibility in light of Dante O. and Tracy O.'s appeal. App. 187 (Order at 10). Anthem maintained its denial, concluding, based in part on Dr. Mayes' conclusions, that New

5

Haven was not "medically necessary." *Id.* at 188 (Order at 11). It noted S.O.'s problems "had been going on for some time" and concluded that she "could be safely treated with outpatient services." *Id.* Anthem notified Dante O. and Tracy O. its decision was "final," and that their "grievance rights with [Anthem] are exhausted." *Id.* Anthem's letter also advised Dante O. and Tracy O. of their ability to seek an independent medical review from the California Department of Managed Health Care (DMHC). *Id.*

Dante O. and Tracy O. requested the DMHC conduct an independent review of Anthem's coverage denial. *Id.* In their letter to the DMHC, they argued that Anthem failed to meaningfully engage with their evidence and arguments. Aplt. Br. at 22–23. The DMHC assigned the matter to MAXIMUS Federal Services, Inc., a private contractor that reviews adverse health benefits decisions. App. 188 (Order at 11). MAXIMUS upheld Anthem's determination that residential treatment at New Haven was not medically necessary. *Id.* at 189 (Order at 12). Specifically, MAXIMUS concluded that, prior to admission at New Haven, there was no evidence that S.O. "was actively suicidal with intent or plan to harm herself during the period at issue." *Id.* at 190 (Order at 13). Therefore S.O. "did not require 24-hour supervision in a residential setting and could have safely been treated at a lower level of care." *Id.*

Dante O. and Tracy O. sued Anthem under ERISA, which provides for judicial review of benefits determinations. 29 U.S.C. § 1132(a)(1)(B). Both parties moved for summary judgment. The district court determined the "Group Benefit Agreement," and by incorporation the "Combined Evidence of Coverage and

6

Disclosure Forms," "constitute the plan documents in this case." App. 191 n.6 (Order at 14 n.6). The district court granted Anthem's motion and denied Dante O. and Tracy O.'s motion, *see id.* at 178–97 (Order), because while there had been "some deterioration of S.O.'s symptoms," the court reasoned the deterioration was not beyond the behaviors S.O. had "consistently" exhibited since middle school, *id.* at 193 (Order at 16). The court determined Anthem's decision was entitled to deference and that the denial of benefits was not "arbitrary and capricious." *Id.* at 194 (Order at 17). The court also concluded Anthem's decision would stand even under de novo review. *Id.* Dante O. and Tracy O. appealed. We first review whether Anthem's denial of health benefits is entitled to deference and conclude that it is. We then review whether Anthem's decision to deny S.O. residential treatment coverage was arbitrary and capricious. We conclude it was not.

## II.

### A.

At the outset, we must determine which documents comprise the governing plan in this case. The administrative record contains the two documents Anthem produced below: the Group Benefit Agreement and the Evidence of Coverage form. We agree with the district court's conclusion that *together* both the Group Benefit Agreement and the Evidence of Coverage form comprise the plan. *Id.* at 191 n.6 (Order at 14 n.6).

First, we conclude that the Group Benefit Agreement is the governing plan instrument between the parties. App. 2767–83. Signed by the president and

7

secretary of Anthem, the Group Benefit Agreement bears all the hallmarks of a governing health insurance contract. It lists the plan's effective date, states the conditions for contract acceptance and termination, chooses to be governed by California law, explains how the agreement can be amended, requires group beneficiaries to indemnify Anthem if unauthorized confidential disclosures are made, and addresses obligations arising from the Health Insurance Portability and Accountability Act (HIPAA). App. 2767–74. The Group Benefit Agreement also defines the circumstances in which parole evidence can be used, and the effect of clerical errors on plan coverage. *Id.* Most importantly, the Group Benefit Agreement does not refer the reader to a different document for particular terms; rather, it states the plan's "benefits are subject to all of the terms and conditions of *this agreement*." *Id.* (emphasis added).

The second document in the record that we consider is the Evidence of Coverage form, which provides the following:

> This Combined Evidence of Coverage and Disclosure (Evidence of Coverage) Form *is a summary of the important terms of your health plan*. The health plan contract must be consulted to determine the exact terms and conditions of coverage. . . . Your employer will provide you with a copy of the health plan contract upon request.

App. 55 (emphasis added). The "summary" language suggests the Evidence of Coverage form serves as a summary plan description (SPD), and we treat it as such. Indeed, an SPD is a plain language explanation of the "rights and obligations" given

8

to plan beneficiaries. 29 U.S.C. § 1022(a). And that is precisely what the Evidence of Coverage form does in this case.

Importantly, the Group Benefit Agreement incorporates the Evidence of Coverage form. In the section titled "General Provisions," the Group Benefit Agreement states "[t]he entire agreement consists of":

1. these administrative pages, including any endorsements;
2. all *Combined Evidence of Coverage and Disclosure Forms*, including any amendments, which are made a part of this agreement;
3. the application of the group; and
4. the individual applications, if any, of eligible persons.

App. 2769 (emphasis added and other italics removed).[3] Accordingly, the district court concluded the Group Benefit Agreement, and by incorporation the Evidence of Coverage form, "constitute the plan documents in this case." App. 191 n.6 (Order at 14 n.6). We agree. The Group Benefit Agreement is the governing plan document, and its incorporation by reference of the Evidence of Coverage form renders both documents, read together, the plan in this case.

Any doubt that the Group Benefit Agreement can incorporate the Evidence of Coverage form as one of the plan documents is dispelled by *Eugene S.* There, this court held that when "the insurer . . . demonstrate[s] that the SPD is part of the

---

[3] Dante O. and Tracy O. argue the Group Benefit Agreement was never "distributed to [p]lan participants and beneficiaries." Aplt. Br. at 32. They do not cite any Tenth Circuit authority for this proposition. Moreover, there is no statutory duty under ERISA to "distribute" a plan; the statute states only that the SPD must be made "available." 29 U.S.C. § 1024(b)(2) ("The administrator shall make copies of the latest summary plan description . . . available for examination by any plan participant or beneficiary . . . ."). *Id.*

9

[p]lan" by pointing to the text of the plan, the SPD is binding. *Eugene S.*, 663 F.3d at 1131–32. In *Eugene S.*, the court concluded the SPD was binding because the "Certificate of Coverage" listed the SPD as part of the entire "Group Policy." *Id.* at 1132. Under such circumstances, the SPD is not just *about* the plan, "it *is* the Plan." *Id.* at 1131. Like the certificate of coverage document in *Eugene S.*, here the Group Benefit Agreement incorporates an SPD, the Evidence of Coverage form. We recognize that, unlike in *Eugene S.*, the Evidence of Coverage form does not state it is part of the plan; instead, the governing plan document incorporates the SPD. *Id.* at 1131. However, we do not see this as being a meaningful distinction. If the SPD can make itself a part of the plan, then the governing documents can incorporate the SPD.

It is true that, as Dante O. and Tracy O. point out, the Evidence of Coverage form directs the reader to consult the "health plan contract" for "the exact terms." App. 55. There is no document in the administrative record labeled "health plan contract," nor does the record contain an overarching master plan document. However, the parties have never disputed that a "health plan contract" was not produced below, and agree that a master plan document "does not exist." *See id.* at 83 (Appellants' summary-judgment response arguing "it is undisputed in this case that a master [p]lan document does not exist and is not before the Court"); Aple. Br. at 26–28 (arguing no documents are missing from the administrative record). Significantly, Dante O. and Tracy O. have never argued, and do not argue before us, that the lack of an overarching master plan document precludes review of

10

their claim. Instead, they argue that the language in the Evidence of Coverage form does not provide for discretionary review, an argument that we reject below.

As noted above, the administrative record contains the two documents Anthem produced below, the Group Benefit Agreement and the Evidence of Coverage form. For the reasons stated above, we conclude that the two documents comprise the plan and that, in particular, the Evidence of Coverage form is part of the plan because it is incorporated by reference in the Group Benefit Agreement. But even if the Evidence of Coverage form were just an SPD and not incorporated as a governing plan document, we would still be permitted to treat it as the plan if the parties have done so. As the Supreme Court explained in *U.S. Airways v. McCutchen*, where the parties "have treated the language from the summary description as though it came from the plan, we do as well." 569 U.S. 88, 92 n.1 (2013). Here, in noting the limited record, the parties have treated the Evidence of Coverage form, an SPD, as the governing document for all intents and purposes. For example, Dante O. and Tracy O. use the SPD's definition of "medical necessity" in their briefing as the plan's operative definition. *See* Aplt. Br. at 17 (citing App. 2169–70). And Anthem insists there is no other master plan document, but rather the Evidence of Coverage form "is the governing plan document." Aple. Br. at 26–27. Because the parties treat the SPD as the operative document, pursuant to *McCutchen*, so do we.[4] We therefore proceed to

---

[4] Further, many of our sister Circuits have concluded that where there is no other governing document available in the record, the SPD may be treated as the governing plan document. *See Rhea v. Alan Ritchey, Inc. Welfare Benefit Plan*, 858 F.3d 340 (5th Cir. 2017) (noting "when an SPD is a plan's only plausible written

11

address the merits of appellants' case under the terms of the plan, as articulated in the Group Benefit Agreement and the Evidence of Coverage form.

**B.**

This court reviews de novo whether an ERISA plan delegates interpretative authority to the plan administrator. *LaAsmar v. Phelps Dodge Corp. Life*, 605 F.3d 789, 796 (10th Cir. 2010). A denial of benefits covered by ERISA is reviewed de novo unless the benefits plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Eugene S.*, 663 F.3d at 1131. Whether a health benefits plan "grants discretion to the plan administrator in reviewing benefits claims" turns on the "plan language." *See id.* at 1132 (entrusting the "medically necessary" determination to the administrator); *Nance v. Sun Life Assur. Co. of Can.*, 294 F.3d 1263, 1267 (10th Cir. 2002) ("Proof must be satisfactory to Sun Life"); *McGraw v. Prudential Ins. Co. of Am.*, 137 F.3d

---

instrument, courts assume that the SPD is the written instrument."); *Prichard v. Metro. Life Ins. Co.*, 783 F.3d 1166, 1170 (9th Cir. 2015) ("*Amara*'s holding assumes the existence of both an SPD *and* a written plan instrument. That is *Amara* addressed only the circumstance where both a governing plan document *and* an SPD existed . . . It did not address the situation . . . [where] the SPD [was] the one and only formal plan document."); *Bd. of Trustees of the Nat. Elevator Indus. Health Benefit Plan v. McLaughlin*, 590 F. App'x 154, 156 n.1 (3rd Cir. 2014) (unpublished) (citing *U.S. Airways* for the proposition the parties treated the SPD as the plan throughout litigation); *Bd. of Trustees of the Nat. Elevator Indus. Health Benefit Plan v. Montanile*, 593 F. App'x 903, 909–11 (11th Cir. 2014) (unpublished) ("[T]he *Amara* Court had no occasion to consider whether the terms of a summary plan description are enforceable where it is the *only* document that" specifies benefits), *rev'd on other grounds by* 644 F. App'x 984 (11th Cir. 2016) (unpublished); *see also Feifer v. Prudential Ins. Co. of Am.*, 306 F.3d 1202, 1209 (2d Cir. 2002) (holding an SPD published long in advance of the master plan could serve as the plan "when it was the only document describing benefits").

1253, 1256 (10th Cir. 1998) (granting administrator authority to decide when treatment is "needed"); *Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 825 (10th Cir. 1996) (excluding coverage for treatment the administrator deems "experimental").

To reiterate, the Evidence of Coverage form states, in bold, all-capital letters, "**THE BENEFITS OF THIS PLAN ARE PROVIDED ONLY FOR THOSE SERVICES THAT WE DETERMINE TO BE MEDICALLY NECESSARY**." App. 182 (Order at 5); *see also id.* at 191 (Order at 14) ("We will determine if services are *medically necessary* and appropriate."). This plan language is nearly identical to the language we held as granting discretionary authority in *Eugene S.* In that case, this court found several instances of plan language sufficient to grant discretion, including: "Horizon BCBSNJ determines what is medically necessary and appropriate." *Eugene S.*, 663 F.3d at 1132. Given that this court has been "comparatively liberal in construing language to trigger the more deferential standard of review under ERISA," *Nance*, 294 F.3d at 1268, this language more than adequately grants discretionary authority to Anthem over benefits claims and triggers arbitrary and capricious review.[5]

---

[5] Whether the "medically necessary" proviso grants discretion to Anthem does not get deference itself. Here, the proviso unambiguously grants deference to Anthem so *contra proferentem* (interpretation against the draftsman) is "inapplicable." *See Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1100–01 (10th Cir. 1999).

13

Dante O. and Tracy O. argue Anthem's "medically necessary" proviso does not convey discretionary authority to Anthem, but merely recognizes "the role insurers always play in evaluating a claim." Aplt. Br. at 35. That argument is inconsistent with *Eugene S.*, where this court held that the language "'Medically Necessary and Appropriate' . . . [as] 'determined by [the plan administrator's] medical director or designee(s)'" was sufficient to grant the administrator discretion in reviewing benefits claims. *Eugene S.*, 663 F.3d at 1132. Thus, we must give deference to Anthem's denial of health benefits.[6]

## C.

We now turn to our final issue: whether Anthem's decision to deny S.O. health benefits was arbitrary and capricious. Because the plan gives Anthem discretion to deny health benefits if the claimed services are not "medically necessary," that decision must be upheld so long as it was not arbitrary and capricious. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 114–15 (1989). Under that standard, the administrator's "decision will be upheld unless it is not grounded on *any* reasonable

---

[6] Dante O. and Tracy O. argued in their opening brief that California Insurance Code § 10110.6 bars the reservation of discretionary authority in a policy for the purposes of affecting judicial review. Aplt. Br. at 37. We do not consider this argument because Dante O. and Tracy O. withdrew the claim in their Reply Brief. Aple. Br. at 28–31; Reply Br. at 13 ("Tracy and Dante withdraw their argument that the California Insurance Code prohibition of discretionary authority clause applies to this case" (capitalization removed)).

14

basis." *Kimber*, 196 F.3d at 1098 (quotations omitted). "This standard is a difficult one for a claimant to overcome." *Nance*, 294 F.3d at 1269.[7]

Arbitrary and capricious review of an ERISA benefits decision looks to "whether: (1) the decision was the result of a reasoned and principled process, (2) is consistent with any prior interpretations by the plan administrator, (3) is reasonable in light of any external standards, and (4) is consistent with the purposes of the plan." *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1193 (10th Cir. 2007) (quotations omitted), *abrogated on other grounds by Metro Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008). A plan administrator's failure to consistently apply the terms of an ERISA plan is arbitrary and capricious. *Owings v. United of Omaha Life Ins. Co.*, 873 F.3d 1206, 1213 (10th Cir. 2017) (holding that shifting interpretations of "disability" was arbitrary and capricious). So is an interpretation inconsistent with the plan's unambiguous language. *Flinders*, 491 F.3d at 1193.

The district court concluded Anthem's denial of S.O.'s residential treatment was reasonable. App. 192 (Order at 15). "Three physicians—Dr. Cottrell, Dr. Bussel, and Dr. Jack—reviewed S.O.'s medical records and treatment history . . . and determined that residential in-patient treatment was not medically necessary." *Id.* at 193 (Order at 16). MAXIMUS' independent review of S.O.'s medical records

---

[7] To be clear, only Anthem's denial of benefits receives *Firestone* deference. The independent medical determination by MAXIMUS does not receive deference, though it adds support to Anthem's decision.

likewise concluded residential treatment at New Haven was "not medically necessary." Aplt. Br. at 23–24. Accordingly, Dante O. and Tracy O. have a difficult task in establishing that Anthem's decision—supported by four doctors—"is not grounded on *any* reasonable basis." *Kimber*, 196 F.3d at 1098 (quotations omitted).

Dante O. and Tracy O. first argue Anthem "ignored the opinions and observations of S.O.'s treating clinicians who knew her best." Aplt. Br. at 41. This, they claim, is arbitrary and capricious, citing *Rasenack* ex rel. *Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1325 (10th Cir. 2009) and *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 823 (2003). These cases are no consolation for Dante O. and Tracy O.: they specifically state "ERISA does not require plan administrators to 'accord special deference to the opinions of treating physicians,' nor does it place 'a heightened burden of explanation on administrators when they reject a treating physician's opinion.'" *Rasenack*, 585 F.3d at 1325 (quoting *Nord*, 538 U.S. at 823). Administrators act within their considerable discretion so long as they do not "arbitrarily refuse to credit . . . the opinions of a treating physician," *Nord*, 538 U.S. at 832. For example, in *Rasenack*, this court held it was arbitrary and capricious for an administrator to deny a claim on the ground there "is *no* evidence" the claimant suffered hemiplegia when in fact the claimant's treating physician submitted a letter concluding that the claimant suffered irreversible hemiplegia. *Rasenack*, 585 F.3d at 1325.

Anthem did not arbitrarily refuse to credit the judgment of S.O.'s treating clinicians; they fully acknowledged S.O. needed medical care. App. 194 (Order at

16

17). Dr. Bussel, for instance, recommended a psychiatric intensive structured outpatient program. *Id.* at 185 (Order at 8). But, as the district court found, "none of S.O.'s treatment providers offered an opinion that S.O.'s symptoms and behaviors represented a deterioration" or that her harmful behavior "could not be managed in an outpatient setting." *Id.* at 193 (Order at 16). In other words, S.O.'s clinicians did not establish that she met the prerequisites for residential treatment. As Dr. Mayes explained: "Due to the nature and chronicity of [S.O.'s] symptoms, I do not see a reasonable expectation that the condition and illness will be stabilized or improved" by residential treatment. *Id.* at 187 (Order at 10).

Dante O. and Tracy O. challenge the district court's finding that S.O.'s treatment providers did not opine that S.O. had deteriorated. They quote Maskin's letter stating that S.O. "was extremely symptomatic and on a daily basis there was concern for her safety," Aplt. Br. at 21, and Dr. Linda Woodall's letter stating that S.O.'s "disorder progressed" since 2009 and she "began to have clear psychotic symptoms" and exhibit "dangerous behavior," *id.* at 45. These letters, however, do not establish that Anthem's decision was arbitrary and capricious. The district court acknowledged there had been "some deterioration of S.O.'s symptoms and behaviors," but no deterioration beyond the "usual status" of the "consistently troubling" "behaviors and symptoms" S.O. had exhibited since middle school. App. 193 (Order at 16). Although Dante O. and Tracy O. claimed S.O.'s symptoms and behaviors were severe enough to require 24-hour, long-term residential care, Dr. Rick Biesinger's psychological evaluation of S.O. for her application to New Haven

17

claims that S.O. "denied having any suicidal ideation." *Id.* at 181 (Order at 4). While S.O. initially told Dr. Biesinger that she cut herself once a day, she later disclosed the last time she did so was "two months ago." *Id.* Dr. Biesinger's diagnosis of S.O. (generalized anxiety, moderate depressive disorder, bulimia nervosa) does not suggest a progression in her symptoms so severe that anything short of residential treatment would "risk serious harm." *Id.*[8] Anthem's denial of coverage cannot be said to lack "*any* reasonable basis." *Kimber*, 196 F.3d at 1098 (quotations omitted). We thus conclude the denial of coverage was not arbitrary and capricious.

### III.

For these reasons, we affirm the district court's judgment.


Entered for the Court


Allison H. Eid
Circuit Judge

---

[8] Dante O. and Tracy O. also argue Anthem misapplied its own "medically necessary" criteria. Aplt. Br. at 48–50. But the "risk serious harm" language that Anthem cited in its denial letter, App. 183 (Order at 6), comes directly from the three-prong criteria identified by the plan to determine whether residential treatment is medically necessary, *see id.*

18

No. 17-4135, *O., et al. v. Anthem Blue Cross Life, et al.*

**BRISCOE**, Circuit Judge.

I concur in the result.