

2003 Decisions

**Opinions of the United States Court of Appeals for the Third Circuit**

7-2-2003

# Burstein v. Retirement Account

Precedential or Non-Precedential: Precedential

Docket No. 02-2666

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

## Recommended Citation

"Burstein v. Retirement Account" (2003). *2003 Decisions.* Paper 330.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/330

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed July 2, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 02-2666
_____

WILLIAM H. BURSTEIN, M.D.; EFRAIN J. CRESPO, M.D.;
RICHARD R. AUSTIN; ELEANOR HING FAY;
JEAN B. HAAS, individually and on behalf of others
similarly situated,

*Appellants*

v.

RETIREMENT ACCOUNT PLAN FOR EMPLOYEES OF
ALLEGHENY HEALTH EDUCATION AND RESEARCH
FOUNDATION, c/o Administrator Dwight Kasperbauer,
individually and as Plan Administrator, and named
fiduciary; DAVID C. McCONNELL; WILLIAM F. ADAM; J.
DAVID BARNES; RALPH W. BRENNER; DOROTHY
MCKENNA BROWN; FRANK V. CAHOUET; DOUGLAS D.
DANFORTH; RONALD R. DAVENPORT; HARRY R.
EDELMAN, III; ROBERT L. FLETCHER; IRA J. GUMBERG;
ROBERT M. HERNANDEZ; FRANCIS B. NIMICK, JR.;
ROBERT B. PALMER; ROBERT M. POTAMKIN; DAVID W.
SCULLEY; W. P. SNYDER, III; MELLON BANK NA;
PENSION BENEFIT GUARANTY CORPORATION, as
successor-in-interest

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 98-cv-06768)
District Judge: Honorable Charles R. Weiner

_____

Argued: April 24, 2003

Before: SCIRICA, *Chief Judge*, AMBRO and
GARTH, *Circuit Judges*

(Opinion Filed: July 2, 2003)

Jay W. Eisenhofer (argued)
Denise T. DiPersio
Grant & Eisenhofer, P.A.
1201 North Market Street,
 Suite 2100
Wilmington, DE 19801

Mark J. Krum
1515 Market Street, Suite 1100
Philadelphia, PA 19102

*Counsel for Appellants*

John F. Schultz (argued)
Kristofor T. Henning
Drinker, Biddle & Reath, LLP
18th & Cherry Streets
One Logan Square
Philadelphia, PA 19103

*Counsel for Appellees*
*Retirement Account Plan and*
*Kasperbauer*

David J. Laurent
Babst, Calland, Clements &
 Zomnir, P.C.
Two Gateway Center
8th Floor
Pittsburgh, PA 15222

*Counsel for Appellee McConnell*

David L. McClenahan (argued)
William T. Cullen
Wendy E. D. Smith
Kirkpatrick & Lockhart
535 Smithfield Street
Henry W. Oliver Building
Pittsburgh, PA 15222

*Counsel for Appellees Adam, Brown,*
*Danforth, Edelman, Fletcher,*
*Gumberg, Hernandez, Nimick,*
*Palmer, Potamkin,and Sculley*

Thomas J. Farrell
Thieman & Farrell
436 Seventh Avenue
2312 Koppers Building
Pittsburgh, PA 15219

*Counsel for Appellee Barnes*

Michele Langer
Marvin, Larsson, Henkin &
 Scheuritzel
1500 Market Street
Centre Square West, Suite 3510
Philadelphia, PA 19102

*Counsel for Appellee Brenner*

James J. Restivo, Jr.
Perry A. Napolitano
Daniel E. Wille
Reed Smith
435 Sixth Avenue
Pittsburgh, PA 15219

*Counsel for Appellee Cahouet*

Anthony W. Clark
Eric M. Davis
Skadden, Arps, Slate, Meagher
 & Flom
One Rodney Square
P.O. Box 636
Wilmington, DE 19899

Henry P. Wasserstein
Jonathan L. Frank
Skadden, Arps, Slate, Meagher
 & Flom
Four Times Square
New York, NY 10036

*Counsel for Appellee Snyder*

Jay H. Calvert, Jr.
Joseph B.G. Fay
Steven D. Spencer
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103
*Counsel for Appellee*
*Mellon Bank, N.A.*

James J. Keightley,
 General Counsel
Jeffrey B. Cohen,
 Deputy General Counsel
Deborah West,
 Senior Assistant General Counsel
Sara B. Eagle (argued)
Joseph M. Krettek
Pension Benefit Guaranty
Corporation
Office of the General Counsel
1200 K Street, N.W.
Washington, DC 20005
*Counsel for Appellee Pension Benefit*
*Guaranty Corporation*

---

## OPINION OF THE COURT

---

GARTH, *Circuit Judge*:

The plaintiff-appellants in this ERISA case appeal from the district court's dismissal of their First Amended Complaint for failure to state a claim and also challenge the denial of their motion to file a Second Amended Complaint as futile.

The plaintiffs are five former employees of the now-bankrupt Allegheny Health Education and Research Foundation ("AHERF"). These plaintiffs sought to recover benefits that they believed they had accrued through AHERF's Retirement Account Plan. They also sought to represent a class of similarly situated persons, though that issue is not before us. The plaintiffs filed various claims

under provisions of the Employee Retirement Income Security Act of 1974, 88 Stat. 891, as amended, 29 U.S.C. § 1001 *et seq.*

As we will explain, in the course of resolving this appeal, we join several other Circuits in ruling that when a summary plan description under ERISA conflicts with the complete, detailed ERISA plan document, a plan participant may nevertheless state a claim for plan benefits based upon terms contained in the summary plan description.

Therefore, and for further reasons specified in this opinion, we will reverse the dismissal of the plaintiffs' claim for plan benefits against the Plan itself and against the Pension Benefit Guaranty Corporation ("PBGC") as Plan administrator, as distinct from guarantor. We will also reverse the dismissal of the plaintiffs' claim for breach of fiduciary duty against Dwight Kasperbauer, the Plan's former administrator. However, we will affirm the dismissal of the remaining counts and of all other defendants, and will also direct the district court to permit the plaintiffs to make a final effort at amending the complaint. Finally, in light of our disposition, which reverses the district court's dismissal of certain counts, we will also reverse the district court's ruling that the plaintiffs' motion for class certification was moot, inasmuch as the counts we are reversing must once again receive the district court's attention.

**I.**

Since this appeal is from a Rule 12(b)(6) motion to dismiss as well as from the denial of leave to file an amended complaint, we have derived our explication of the facts from the allegations contained in the plaintiffs' First Amended Complaint, supplemented by some additional facts alleged in the proposed Second Amended Complaint.

*A. The Parties*

The plaintiffs-appellants in this case are William H. Burstein, M.D., Efrain J. Crespo, M.D., Richard R. Austin, Eleanor Hing Fay, and Jean B. Haas. According to the

proposed Second Amended Complaint ("SAC" or "complaint"), Burstein was employed as a doctor at AHERF for four years, and became an employee of the Tenet Healthcare Corporation when Tenet purchased some of AHERF's assets. Crespo had been employed as a doctor by AHERF for "less than five years," SAC ¶ 13, and also became a Tenet employee. Austin had been employed by AHERF as director of major gifts and planned giving at St. Christopher's Hospital for three and a half years. Hing Fay had been employed by AHERF for two and three-quarters years in the Corporate and Foundation Relations department at St. Christopher's Hospital for Children. Haas had been employed by AHERF for one year in the development office of (we assume) St. Christopher's Hospital.[1] AHERF laid off Austin, Hing Fay, and Haas on September 30, 1998, and Tenet did not hire them.[2]

There are several defendants-appellees in this case. They are: (1) the Plan itself; (2) the PBGC;[3] (3) Dwight Kasperbauer, the former Plan administrator, and a former executive vice president and chief of human resources at AHERF; (4) the Plan's former asset manager, David McConnell, who had been AHERF's chief financial officer; (5) the members of the Plan sponsor's Board of Trustees ("AHERF Trustees");[4] and (6) the Plan's custodial trustee, Mellon Bank.

---

1. The complaint does not specify at which "Development Office" Haas worked. SAC ¶ 19.

2. We will refer to these five plaintiffs collectively as "Burstein."

3. The PBGC "is a wholly owned United States Government corporation . . . The PBGC administers and enforces Title IV of ERISA. Title IV includes a mandatory Government insurance program that protects the pension benefits of [tens of millions of] private-sector American workers who participate in plans covered by the Title." *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 636-37 (1990) (citing 29 U.S.C. § 1302) (other citations omitted).

Burstein has sued PBGC both in its role as statutory guarantor under Title IV of ERISA and in its role as the substituted administrator for Kasperbauer, the former Plan administrator. As substituted administrator, PBGC now administers the terminated Plan. We explain this distinction in Part III, *infra*.

4. The AHERF Trustees, according to the complaint, are William F. Adam, J. David Barnes, Ralph W. Brenner, Dorothy McKenna Brown,

### *B. The Events Leading to the Lawsuit*

In 1988, AHERF, which operated hospitals and other health-care facilities in western Pennsylvania, began acquiring hospitals and associated physician practices and medical schools in the Philadelphia area.

AHERF had begun to experience significant financial losses by the late 1990s. In July 1998, AHERF filed for bankruptcy. The complaint alleges that AHERF, a non-profit corporation, was profligate in its expenditures and generous (to a fault) in furnishing its executives with compensation, stock options, travel opportunities, and the like. SAC ¶¶ 43-44, 49, 51, 53, 55.

In the months prior to filing for bankruptcy, AHERF made an $89 million payment on a line of credit to Mellon Bank (the Plan's custodial trustee), *id.* ¶ 47, and the complaint alleges that Mellon Bank, and certain trustees with relationships to the bank, exerted improper influence to secure this payment. *Id.* ¶ 48.

The bankruptcy court auctioned off AHERF's assets, including eight Philadelphia-area hospitals. The eight hospitals were purchased by Tenet, a for-profit health care company. The Retirement Account Plan was not acquired by Tenet. SAC ¶¶ 56-57.

AHERF's Retirement Account Plan was a defined benefit pension plan under ERISA.[5] The AHERF Plan was a "cash

---

Frank V. Cahouet, Douglas D. Danforth, Ronald R. Davenport, Harry R. Edelman, III, Robert L. Fletcher, Ira J. Gumberg, Robert M. Hernandez, Francis B. Nimick, Robert B. Palmer, David W. Sculley, and W.P. Snyder, III. SAC ¶¶ 24-34, 36-39. Our disposition of claims against the AHERF Trustees does not require differentiating among them except where noted.

5. According to ERISA,

> The term "defined benefit plan" means a pension plan other than an individual account plan; except that a pension plan which is not an individual account plan and which provided a benefit derived from employer contributions which is based partly on the balance of the separate account of a participant—

balance plan,"[6] a form of a defined benefit plan under ERISA in which "the employer's contribution is made into hypothetical individual employee accounts." SAC ¶ 66. The complaint alleged that because the Plan "speaks in terms of a participant's 'account,' many participants are fooled into thinking that the cash balance plan works like a defined contribution plan." *Id.* Under a cash balance plan, however,

----

> (A) for the purposes of section 202 . . . shall be treated as an individual account plan, and

> (B) for the purposes of paragraph (23) of this section and section 204 . . . shall be treated as an individual account plan to the extent benefits are based upon the separate account of a participant and as a defined benefit plan with respect to the remaining portion of benefits under the plan.

29 U.S.C. § 1002(35). ERISA defines an individual account plan (or "defined contribution plan") as "a pension plan which provided for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account." *Id.* § 1002(34).

6. The Employee Benefits Security Administration (the agency of the Department of Labor responsible for administering and enforcing provisions of Title I of ERISA) has explained the difference between traditional defined benefit pension plans and cash balance plans as follows:

> While both traditional defined benefit plans and cash balance plans are required to offer payment of an employee's benefit in the form of a series of payments for life, traditional defined benefit plans define an employee's benefit as a series of monthly payments for life to begin at retirement, but cash balance plans define the benefit in terms of a stated account balance. *These accounts are often referred to as hypothetical accounts because they do not reflect actual contributions to an account or actual gains and losses allocable to the account.*

U.S. Department of Labor, Employee Benefits Security Administration, "Frequently Asked Questions about Cash Balance Pension Plans," *at* http://www.dol.gov/ebsa/FAQs/faq_consumer_cashbalanceplans.html (as visited May 23, 2003) (emphasis added).

if the plan terminates, "it is possible that the plan will be underfunded as to some or all of the participants." *Id.*

Indeed, ERISA does not require that the cash-balance plan sponsor fund the plan fully for all participants; rather, it only requires that these plans be funded for those participants whose benefits had vested prior to the plan's (partial) termination.[7] Burstein has not claimed that AHERF failed to fund the Plan in accordance with these minimum standards.

Burstein alleges that he was surprised to learn that AHERF had not funded the Plan for the benefits he believed had accrued. According to the complaint, the Plan administrator, defendant Kasperbauer, mailed form letters dated November 25, 1998, to various former employees. The complaint alleges that the letter sent to Burstein was addressed to "Former AHERF Employees who Transferred to Tenet or the New University." This letter explained that a partial plan termination had occurred, but that any person who had not completed five years of service with AHERF would not be entitled to any benefits:

> As you may be aware, the Retirement Account Plan also contains a provision, required by the Internal Revenue Code, concerning vesting in the event of a partial plan termination. Specifically, this provision states that, if there is a partial plan termination, the nonvested benefits of affected participants will become vested "to the extent funded." We believe that a partial plan termination did occur because of the sale of the hospitals to Tenet and the sale of Allegheny University of the Health Sciences. However, *because nonvested accrued benefits under the Plan are not "funded" within the meaning of this provision, you will not be entitled to any benefits from the Plan if, as of Nov. 10, 1998, you have not completed at least five years of vesting service.*

Letter from Kasperbauer to Burstein at 1, A233 (emphasis in original).

---

7. ERISA outlines the minimum funding standards for employee pension benefit plans. *See* 29 U.S.C. § 1082. The Internal Revenue Code also imposes minimum funding standards for a plan's qualification for preferential tax treatment. *See* 26 U.S.C. § 412.

The PBGC and AHERF agreed on September 30, 1999, that the Plan should be deemed terminated as of August 25, 1999, based on PBGC's determination that the Plan would be unable to pay benefits when they became due. Accordingly, the PBGC took over the Plan on September 30, 1999. *See* Agreement for Appointment of Trustee and Termination of Plan, A526-27.

### C. Procedural History Leading to the Proposed Second Amended Complaint

On December 30, 1998, shortly after receiving the letters from Kasperbauer (but before the PBGC took over the Plan on September 30, 1999), Burstein filed the initial complaint in the United States District Court for the Eastern District of Pennsylvania. The bankruptcy court for the Western District of Pennsylvania stayed the case in April 1999 at the request of AHERF's bankruptcy trustee. In July 2000, the bankruptcy court lifted the stay. Burstein filed the First Amended Complaint on August 10, 2000, and the defendants moved to dismiss. In addition to opposing the motion to dismiss, Burstein sought leave to file a proposed Second Amended Complaint.

### D. The Claims in the Second Amended Complaint

The Second Amended Complaint contains eleven counts, which can be grouped into three categories of claims,[8] though, as the district court explained, Burstein did not fully specify the connection between his claims and the provisions of ERISA. *See Burstein v. Retirement Account Plan for Employees of Allegheny Health, Education and Research Foundation*, ___ F. Supp. 2d ___, 2002 WL 31319407, at *7 (E.D. Pa. May 30, 2002). The complaint contains class action allegations, but the issue of class certification is not before us on appeal in view of the fact that the district court denied Burstein's motion to file the Second Amended Complaint. Because we are reversing on some counts of the First Amended Complaint, we deem it

---

8. In addition to the first ten counts that fit within the three categories, Count XI is a claim for attorneys' fees. SAC ¶ 207.

appropriate for the district court to reconsider its class certification ruling in light of this opinion.[9]

### *Category One: Claims for Plan Benefits (Counts VII-X)*

One category of counts (Counts VII-X) in Burstein's Second Amended Complaint involves claims for *plan benefits* under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)[10] against the Plan and the PBGC.[11]

---

9. The district court denied Burstein's motion for class certification as moot in light of its dismissal of the complaint for failure to state a claim. In view of our disposition, we will reverse the order denying class certification.

10. This provision of ERISA provides that a plan participant may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

11. At oral argument, Mr. Eisenhofer, counsel for Burstein, conceded that, in his view, apart from the Plan and the PBGC, none of the other defendants were proper defendants with respect to this category of counts.

> THE COURT: . . . I don't understand how any one of the defendants you have named can be liable other than the Plan, and I realize the Plan has very lean pockets.
> How do you get Mr. Kasperbauer as a defendant? And he's the only administrator that I know of.

> MR. EISENHOFER: I believe we get him as defendant on the breach of fiduciary duty claim.

> THE COURT: What about the benefits claim? . . .

> MR. EISENHOFER: I don't believe that Mr. Kasperbauer is an appropriate — there's [an] appropriate remedy against Mr. Kasperbauer on the benefits [claim].

> THE COURT: So that the only appropriate defendant in the category of benefits claim, then, would be the Plan, and you feel that you should be able to litigate that or go beyond at least the 12(b)(6) as to the Plan, am I correct?

> MR. EISENHOFER: The Plan, and to the extent that PBGC stands as the successor in interest to the Plan . . .

Tr. of Oral Arg. at 26-27.

Count VII asserts that Burstein "became eligible to vest in 100% of [his] accrued benefits" "[w]hen AHERF partially terminated the Plan." SAC ¶¶ 186-189.

Count VIII alleges that the "PBGC is obligated, as the statutory trustee [i.e., substituted administrator] of the Plan," to pay benefits to Burstein. SAC ¶¶ 190-194. As we explain in note 23, *infra*, Kasperbauer, at this time, was no longer the administrator of the Plan, and the Plan had PBGC as its substitute administrator. As such, PBGC, as *administrator*, had the obligation of distributing Plan assets according to statute. Hence, counsel's colloquy, reproduced at note 11, *supra*, must be understood as relieving all defendants other than the Plan and the Plan's present administrator, PBGC, from liability under the claim for plan benefits.

Count IX alleges that the "PBGC is statutorily required to insure the payment of all nonforfeitable benefits." SAC ¶¶ 195-200.

Count X alleges that because the PBGC collected premiums from AHERF to insure plan assets, "the PBGC created an insurer-insured relationship with Plaintiffs" obligating the PBGC to pay benefits. SAC ¶¶ 201-206.

Taken together, then, Counts VII-X may be read as claims for plan benefits, but only against the Plan and the PBGC. (*But see infra*, where we have held that PBGC may be liable as substituted administrator but not as a guarantor. *See infra* note 23 and Part III(D)).

### *Category Two: Equitable Estoppel Claim (Count VI)*

Count VI alleges an equitable estoppel claim against Kasperbauer, McConnell, and the Trustees, alleging that they intended to induce, should have anticipated, or in any event are responsible for, Burstein's reliance on "misrepresentations in the Plan Brochure and SPD." SAC ¶¶ 179-185.

### *Category Three: Claims for Breach of Fiduciary Duty (Counts I-V)*

Counts I-V of the Second Amended Complaint allege various breaches of alleged fiduciary duty. Count I alleges

that Kasperbauer, McConnell, and the AHERF Trustees breached their fiduciary duties to Burstein in violation of ERISA § 404(a), 29 U.S.C. § 1104(a), by representing, "through the Plan Brochure, the SPD and/or verbal communications," that if the Plan was terminated, all participants would automatically become vested and entitled to benefits.

Count II alleges that Kasperbauer, McConnell, Mellon Bank, and the AHERF Trustees failed to warn Burstein of AHERF's imminent bankruptcy and the Plan's underfunding. Further, Count II alleges that the defendants had failed to warn Burstein that he had been misled about his benefits under the Plan Brochure and SPD. Count II charges that such failures to warn constitute a failure to discharge fiduciary duties.

Count III alleges that Kasperbauer, McConnell, and the AHERF Trustees mismanaged plan assets "in one of the most favorable investment climates in history, resulting in an asset shortfall," and allowed an "$89 million payment to Mellon Bank." SAC ¶¶ 156-61.

Count IV alleges that Mellon Bank mismanaged plan assets and "improperly influenced AHERF to make an $89 million payment" prior to AHERF's bankruptcy filing. SAC ¶¶ 162-72.

Count V alleges that certain AHERF Trustees (Cahouet, Barnes, Gumberg, Adam, and Fletcher) held positions or were affiliated with Mellon Bank, and improperly influenced AHERF to make the $89 million payment to the bank. Burstein claims that this action breached these Trustees' fiduciary duties. SAC ¶¶ 173-178.

These claims for breach of fiduciary duty under ERISA are brought pursuant to ERISA § 502(a)(3)(B), 29 U.S.C. § 1132(a)(3)(B). *See Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996). We discuss these claims *infra* in Part V.[12]

---

12. We note that the Supreme Court has drawn a distinction between legal and equitable remedies in detailing what remedies are available under ERISA § 502(a)(3)(B) in its recent decision in *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204 (2002).

### *E. The District Court's Decision*

In a memorandum opinion and order dated May 30, 2002, the district court granted all of the defendants' motions to dismiss the First Amended Complaint with prejudice for failure to state a claim; denied Burstein's motion to file a Second Amended Complaint as futile; and denied the motion for class certification as moot.

The district court first held that Burstein could not recover under his claims for plan benefits, citing our decision in *Gridley v. Cleveland Pneumatic Co.*, 924 F.2d 1310 (3d Cir. 1991). The district court held that, under ERISA § 502(a)(1)(B), "employees cannot recover from the Plan[,] benefits which are allegedly granted or due under a summary plan description [SPD] or other secondary document." *Burstein*, ___ F. Supp. 2d ___, 2002 WL 31319407, at *7 (citing *Gridley*, 924 F.2d at 1318). Under the district court's reading of *Gridley*, because the explicit terms of the Plan Document itself did not provide Burstein with a right to benefits, Burstein could not rely on terms of the SPD to assert a claim for benefits.

The district court next dismissed Burstein's equitable estoppel claim, questioning whether the elements of an equitable estoppel claim could be satisfied, but holding that Burstein had no standing to enforce the Plan against the defendants named in this count.

Finally, the district court dismissed all of the breach of fiduciary claims, holding that all but one of the defendants, though named fiduciaries, were not fiduciaries for the purposes of events identified by Burstein that could give rise to claims for breach of fiduciary duty. As to the claims against Kasperbauer, the administrator, for breach of fiduciary duty relating to alleged misrepresentations in the SPD and Plan brochure, the district court held that Burstein might have been able to state a claim if he had alleged that there was reliance to his detriment on the alleged misrepresentations. Holding that no such detrimental reliance had been pled, the district court dismissed the claim against Kasperbauer.

Burstein filed a timely notice of appeal on June 13, 2002. This appeal followed.

## II.

The district court had subject matter jurisdiction of this civil action arising under ERISA pursuant to 29 U.S.C. § 1132(f) and 28 U.S.C. § 1331, and, with respect to claims against the PBGC, pursuant to 29 U.S.C. § 1303(f). We have jurisdiction over this appeal from the district court's final judgment pursuant to 28 U.S.C. § 1291.

We have plenary review of the district court's grant of a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). *See Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996). In considering an appeal of a granted Rule 12(b)(6) motion, we do not analyze whether Burstein will ultimately prevail, but only whether he is entitled to offer evidence to support his claims, attributing all reasonable inferences in favor of Burstein. Thus, we will affirm the district court's order granting the defendants' motion to dismiss only if it appears that Burstein could prove no set of facts that would entitle him to relief. *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Nami*, 82 F.3d at 65.[13]

## III.

We first examine the district court's dismissal of Burstein's claims for plan benefits. (Category One — Counts VII - X).

## A.

Burstein alleges that language in both the Plan Brochure and the Summary Plan Description gave rise to his claims for plan benefits. The complaint alleges that the Plan Brochure "conveys the impression that each participant has a funded 'account' under the Plan in which they accrue

---

13. We review a district court's decision denying leave to file an amended complaint for abuse of discretion. *See, e.g.*, *Bailey v. United Airlines*, 279 F.3d 194, 203 (3d Cir. 2002). Our determination that the district court should allow Burstein to file a Third — and final — Amended Complaint results from our holding that the district court erred in dismissing the entire complaint for failure to state a claim, and should not be read as critical of the district court's denial of leave to amend. *See infra* note 32.

retirement benefits." SAC ¶ 75. Specifically, Burstein points to the Plan Brochure's statements that:

> "AHERF contributes to your account each year based on your pay, age and service. Your account earns interest at a guaranteed individual rate." . . . [and]

> "You have your own interest bearing account that is **completely funded** by the organization."

*Id.*

In addition, Burstein cited statements in the Plan Brochure such as:

- "Retirement Account Plan 100% funded by AHERF ";

- "You own your account after five years";

- "You always own your account"; and

- "Guaranteed Interest . . . the minimum amount your account will earn is 5% per year . . . You will receive an account statement at least once a year showing how your account has grown."

SAC ¶ 76.[14]

The complaint alleged that the Summary Plan Description "reinforces the impression created by the Plan Brochure that each participant had a fully funded account in which retirement benefits were accrued and grew each year," SAC ¶ 83, and cites various statements describing how "your account is credited." *Id.* The SPD states:

> A special account is used to record your annual retirement credits and other increases in your benefit

---

14. The Plan Brochure to which Burstein refers is significantly different and less detailed than the SPD or the Plan Document itself. A plan brochure is distinct from a plan document in that it is neither comprehensive or detailed, and is more akin to a commonplace flyer. Whereas Congress has expressed its intent with respect to SPDs, it has not expressed any such intent with respect to plan brochures. *See* 29 U.S.C. § 1022; *see also* discussion *infra* at pages 22-24. Accordingly, a plan brochure cannot form the basis for plan benefits. Although Burstein has pointed to language in the Plan Brochure, our decision here pertains only to the SPD, not to the Plan Brochure.

> amount. While your account balance under the Retirement Account Plan is a way of expressing your plan benefit, no plan assets are specifically allocated to your plan account. Instead they are held in a trust for all participants.

SAC ¶ 86. The complaint alleges that though a reader "may understand from this language . . . that the funds . . . are not held separately," nonetheless such a reader would interpret the language "to mean that sufficient assets to fund the individual account balances have been set aside and are held in trust." *Id.*

The complaint alleges that the SPD explains that once a participant is vested, he or she has "a nonforfeitable right to the value of [his or her] account." SAC ¶ 87 (quoting SPD at 14, A208). In general, under the Plan, a participant is not deemed vested until he or she has completed five years of service. Central to this case, however, the SPD provides that a plan participant *will become vested* upon the termination of the Plan:

> If the Plan is terminated you will *automatically become vested* in your account*, regardless of how many years of service* you have earned. No more annual retirement credits will be made to your account, but you will continue to receive interest credits until payments from your account begin.

SAC ¶ 87 (quoting SPD at 25, A219) (emphasis added).

By contrast, the language of the Plan Document imposes a significant qualification on a Plan participant's vesting in his or her account:

> Upon the termination or partial termination of the Plan, the right of all affected participants to benefits accrued to the date of such termination or partial termination shall become nonforfeitable (within the meaning of Treas. Reg. § 1.411(a)-4) *to the extent funded* as of such date.

Plan § 16.2, A400 (emphasis added).[15]

---

15. We note that this Plan Document language is patterned after § 411(d)(3) of the Internal Revenue Code, which states that a plan will not be qualified for preferential tax treatment unless it:

The SPD differed from the Plan Document in the way it described the terms of vesting and funding. In this case, however, AHERF — presumably by design — funded the Plan at the minimum level permissible under ERISA. These minimum ERISA funding standards did not require AHERF to fund the Plan for those participants who had not yet met the five-year service requirement for vesting.[16]

### B.

The district court held that the conflict between the terms of the SPD and the terms of the Plan Document did not permit Burstein to state a claim that he was "due" benefits within the meaning of ERISA § 502(a)(1)(B). The district court grounded this conclusion on its interpretation of our decision in *Gridley v. Cleveland Pneumatic Co.*, 924 F.2d 1310 (3d Cir.), *cert. denied*, 501 U.S. 1232 (1991). The district court read *Gridley* to hold that a court must only look to the Plan Document, and therefore determined that the language contained in the SPD could not operate to create a right to plan benefits.

On appeal, Burstein argues that the district court misinterpreted *Gridley*. He argues that an SPD can be considered in assessing what benefits are "due" under a claim for plan benefits pursuant to ERISA § 502(a)(1)(B). Kasperbauer and the PBGC take the contrary position that

---

provides that—
   (A) upon its termination or partial termination, or
   (B) in the case of a plan to which section 412 does not apply, upon complete discontinuance of contributions under the plan,

the *rights* of all affected employees *to benefits accrued to the date of such termination, partial termination,* or discontinuance, *to the extent funded* as of such date, or the amounts credited to the employees' accounts, *are nonforfeitable.* . . .

26 U.S.C. § 411(d)(3) (emphasis added).

16. As we have noted, there is no allegation that the way in which the Plan was funded violated ERISA's funding requirements. We also are not informed whether it is typical that a plan sponsor will fund a plan at the minimum level that ERISA permits.

*Gridley* has "squarely held" that an SPD cannot allow for recovery of benefits under § 1132(a)(1)(B). Kasperbauer Br. at 29-30; *see also* PBGC Br. at 12 n.8 (also citing *Gridley*).

After a careful and thorough review of *Gridley*, we have concluded that the language in *Gridley* on which the district court relied constitutes dictum, and therefore does not bind us in determining whether a conflict between an SPD and a plan document can give rise to a claim for plan benefits.[17]

In *Gridley*, this Court examined the availability of certain benefits under a life insurance plan. *Gridley*, 924 F.2d at 1311. Gridley based her claim on language in an "overview brochure" that conflicted with, or was silent about, additional requirements contained in the plan document language. *Id.* at 1314.

The district court held in favor of Gridley on the grounds that the brochure constituted a "summary plan description," the terms of which were enforceable. *Id.* at 1315. The *Gridley* Court reversed the district court's decision, "both because the new overview brochure. . . was not a summary plan description and because a summary plan description is not a 'plan' within the meaning of Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)." *Id.* at 1316. The Court explained that the overview brochure on which Mrs. Gridley based her claim did not constitute a "summary plan description" for several reasons:

> First, the new overview brochure . . . contains an important internal reference to "summary plan descriptions." . . .
>
> Second, the new overview brochure . . . lacks virtually all of the categories of information required by ERISA for summary plan descriptions. Under 29 U.S.C. § 1022(b), a summary plan description must contain 12 categories of information . . . The new overview

---

17. *See* Third Circuit Internal Operating Procedure 9.1 ("It is the tradition of this court that the holding of a panel in a precedential opinion is binding on subsequent panels. Thus, no subsequent panel overrules the holding in a precedential opinion of a previous panel. Court en banc consideration is required to do so.").

> brochure's . . . description of the life insurance plans, however, lacks any information relating to all but two of these categories . . .

> Third, the new overview brochure . . . contains extraordinarily perfunctory descriptions of subjects treated in other company documents that unquestionably constituted summary plan descriptions. . . .

> Finally, the new overview brochure . . . was plainly an updated version of the earlier overview brochure . . . which was not a summary plan description. As already noted, when Mr. Gridley received the earlier overview brochure . . . at the beginning of his employment, he was also given summary plan descriptions for some of the company's plans. In light of these detailed documents, there can be no doubt that the cursory descriptions of the same plans in the earlier overview brochure . . . did not constitute the summary plan descriptions for those plans.

*Id.* at 1316-17 (citations and footnote omitted).

Thus, in *Gridley* we held no more than: Gridley could not recover benefits because there was no summary plan description on which to base her claim, since the overview brochure on which she relied did not constitute an SPD. Our holding in *Gridley* that there was no SPD cannot be read as stating that the terms of a plan document override the language of the SPD where they conflict. This being so, *Gridley* is not a holding that the plan document is superior to, or trumps, the SPD, and accordingly, it cannot bind us to this principle as precedent.

It is true that *Gridley* does discuss the term "plan" as it appears in ERISA, and claims that it does not encompass a summary plan description. *See id.* at 1318. However, once *Gridley* held that no summary plan description existed, its discussions as to the place of a summary plan description in the statutory scheme can constitute no more than dictum. And while the district court understandably may have been influenced by that dictum, neither we nor the district court are bound to respect it as precedent.

Our understanding of *Gridley* is fortified by the decisions of several other Circuits, all of which have held that a summary plan description will govern over contradictory or conflicting terms in the Plan Document. For example, the Eleventh Circuit has declared, in a much-cited opinion:

> It is of no effect to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complicated document, and then proclaim that any inconsistencies will be governed by the plan. Unfairness will flow to the employee for reasonably relying on the summary booklet.

*McKnight v. Southern Life and Health Ins. Co.*, 758 F.2d 1566, 1570 (11th Cir. 1985).

The Second Circuit has agreed with this view of the summary plan description:

> [O]nly the Booklet, not the Plan itself, was distributed to employees. The Booklet purported to summarize the Plan. ERISA and the regulations promulgated under it require that employees be given such summaries. . . . *Thus, the statute contemplates that the summary will be an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary.* To allow the Plan to contain different terms that supersede the terms of the Booklet would defeat the purpose of providing the employees with summaries.

*Heidgerd v. Olin Corp.*, 906 F.2d 903, 907-08 (2d Cir. 1990) (citing 29 U.S.C. § 1022; 29 C.F.R. § 2520.102-2(a) (1989)). In addition to the Eleventh and Second Circuits, the Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, and Tenth Circuits have all adopted similar views (though somewhat varying in scope, precise context, and extent) that if the SPD language differs from or conflicts with the plan language, it is the SPD language that will control.[18]

---

18. *See Pierce v. Security Trust Life Ins. Co.*, 979 F.2d 23, 27 (4th Cir. 1992) (per curiam) ("if there was a conflict between the complexities of the plan's language and the simple language of the SPD, the latter would control"); *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 982 (5th Cir.

Today, we join with the other Courts of Appeals that have considered this issue, and hold that, where a summary plan description conflicts with the plan language, it is the summary plan description that will control. We are satisfied that this holding, as we have stated it, is faithful to Congressional intent. The ERISA provision governing summary plan descriptions expresses Congress's desire that the SPD be transparent, accurate, and comprehensive:

> A summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries as provided in section 1024(b) of this title. The summary plan description shall include the information described in subsection (b) of this section, *shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan.* A

---

1991) ("the summary plan description is binding, and . . . if there is a conflict between the summary plan description and the terms of the policy, the summary plan description shall govern. Any other rule would be, as the Congress recognized, grossly unfair to employees and would undermine ERISA's requirement of an accurate and comprehensive summary."); *Edwards v. State Farm Mut. Auto Ins. Co.*, 851 F.2d 134, 136 (6th Cir. 1988) ("statements in a summary plan are binding and if such statements conflict with those in the plan itself, the summary shall govern"); *Senkier v. Hartford Life & Acc. Ins. Co.*, 948 F.2d 1050, 1051 (7th Cir. 1991) ("The insured is protected by the fact that, in the event of a discrepancy between the coverage promised in the summary plan document and that actually provided in the policy, he is entitled to claim the former."); *Barker v. Ceridian Corp.*, 122 F.3d 628, 633 (8th Cir. 1997) ("Summary plan descriptions are considered part of ERISA plan documents. . . . Adequate disclosure to employees is one of ERISA's major purposes. . . . Because of the importance of disclosure, in the event of a conflict between formal plan provisions and summary plan provisions, the summary plan description provisions prevail.") (citations omitted); *Atwood v. Newmont Gold Co.*, 45 F.3d 1317, 1321 (9th Cir. 1995) ("Where the SPD . . . differs materially from the terms of the plan, the SPD is controlling."); *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1515 (10th Cir. 1996) ("Because the SPD best reflects the expectations of the parties to the plan, the terms of the SPD control the terms of the plan itself.").

> summary of any material modification in the terms of the plan and any change in the information required under subsection (b) of this section shall be written in a manner calculated to be understood by the average plan participant and shall be furnished in accordance with section 1024(b)(1) of this title.

29 U.S.C. § 1022(a) (emphasis added).[19] *See also* 29 U.S.C. § 1022(b) (setting forth information that must be included in an SPD). Indeed, § 1022(b) requires that an SPD provide "the plan's requirements respecting eligibility for participation and benefits; a description of the provisions providing for nonforfeitable pension benefits; [and] circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." *Id.*

Thus, "ERISA requires, in no uncertain terms, that the summary plan description be 'accurate' and 'sufficiently comprehensive to reasonably apprise' plan participants of their rights and obligations under the plan." *Hansen,* 940 F.2d at 981 (quoting 29 U.S.C. § 1022). The SPD is the document to which the lay employee is likely to refer in obtaining information about the plan and in making decisions affected by the terms of the plan. Indeed, the SPD in this case suggests that the Plan Document is *not* provided to employees as a matter of course, but must be either inspected on AHERF's designated premises or requested in writing. The front page of the SPD, after explaining that the "[P]lan [D]ocument always governs" if there is a difference between the SPD "booklet" and the "official [P]lan [D]ocument," describes how and where a participant may read the official Plan Document:

> You may look at the [P]lan [D]ocument during regular business hours at the Allegheny Health, Education and Research Foundation, Benefit Service Center, Suite 260, One Allegheny Center, Pittsburgh, Pennsylvania 15512-5408. You also may obtain a copy of the official [P]lan [D]ocument by writing to the Benefit Service

---

19. Section 1024(b) provides detailed requirements as to how a plan administrator must publish and furnish summary plan descriptions to plan participants or beneficiaries.

Center. A small charge may be made to cover the copying costs.

SPD at 1, A195. The relative inaccessibility of AHERF's Plan Document serves to highlight that, as Congress intended, the SPD is the primary document on which plan participants must rely.

Some of the defendants-appellees argue that an SPD is, by its nature, a *summary*, and cannot include all the terms contained in the full Plan. Of course this is so, and it would defeat the purposes of having a summary of a full plan document if the SPD were to parrot all the terms of the plan document. In this case, however, the conflict between the SPD and the Plan Document is unquestionably material. The SPD indicates to the Plan participant that the Plan assets are held in a trust and that benefits will "automatically vest" upon Plan termination. But, as we have earlier noted, the Plan Document here *does not* provide for full funding or for unqualified vesting. The fact that the AHERF Retirement Account plan would not be fully funded is never expressed in the Summary Plan Description.

As we have explained, the SPD states, "If the plan is *terminated* you will *automatically become vested* in your account, regardless of how many years of service you have earned." SPD at 25, A219 (emphasis added). By contrast, the Plan says:

Upon the *termination or partial termination* of the Plan, the rights of all affected participants to benefits accrued to the date of such termination or partial termination shall become nonforfeitable (within the meaning of Treas. Reg. § 1.411(a)-4) *to the extent funded* as of such date.

Plan § 16.2, A400 (emphasis added).

The difference that exists between the SPD and the Plan Document respecting how much would be available to a vested participant is not only stark but presents a material conflict that the PBGC does not address. It does not address that conflict because, under its reading of *Gridley*, it is the Plan Document that governs, whereas under our

interpretation and reading of *Gridley*, it is the SPD that governs. Hence, where the PBGC finds no conflict — we do. The PBGC's argument that the SPD is "silent" with respect to *partial termination* is unavailing. We are satisfied that "[i]f the plan is terminated," that termination applies with equal force to a completed termination as well as to a partial termination of the Plan. Thus, we reject the PBGC's argument that no conflict exists.

## C.

We also conclude that a plan participant who seeks to claim plan benefits on the basis of a conflict between an SPD and a plan document need not plead reliance on the SPD. We recognize that other Courts of Appeals that have spoken to this issue have taken differing positions on this question.

The Eleventh Circuit, for example, has declared: "We . . . hold that, to prevent an employer from enforcing the terms of a plan that are inconsistent with those of the plan summary, a beneficiary must prove reliance on the summary." *Branch v. G. Bernd Co.,* 955 F.2d 1574, 1579 (11th Cir. 1992). The First, Fourth, and Seventh Circuits have similarly required reliance.[20]

The Sixth Circuit, by contrast, has disclaimed the necessity of reliance. In *Edwards v. State Farm Mutual Auto Ins. Co.*, 851 F.2d 134 (6th Cir. 1988), the Sixth Circuit explained that, "[a]lthough in the instant case, the appellee

---

20. *See Govoni v. Bricklayers, Masons and Plasterers Int'l Union*, 732 F.2d 250, 252 (1st Cir. 1984) ("[c]ase law suggests . . . that to secure relief, Govoni must show some significant reliance upon, or possible prejudice flowing from, the faulty plan description"); *Aiken v. Policy Mgmt. Sys. Corp.*, 13 F.3d 138, 141-42 (4th Cir. 1993) (holding that showing of reliance or prejudice necessary, but reversing and remanding district court's grant of summary judgment against plan participant for "for further development of the record on the issue of reliance or prejudice"); *Health Cost Controls of Illinois, Inc. v. Washington*, 187 F.3d 703 (7th Cir. 1999) (if "the plan and the summary plan description conflict, the former governs . . . unless the plan participant or beneficiary has reasonably relied on the summary plan description to his detriment"), *cert. denied*, 528 U.S. 1136 (2000).

relied to his detriment . . . existing precedent does not dictate that a claimant who has been misled by summary descriptions must prove detrimental reliance. Congress has promulgated clear directives prohibiting misleading summary descriptions. This court elects not to undermine the legislative command by imposing technical requirements upon the employee." *Id.* at 137.

The Second Circuit has not provided a definitive answer to this question. In *Feifer v. Prudential Insurance Co. of America*, 306 F.3d 1202 (2d Cir. 2002), that court stated, "Unlike most other circuits, this Court has not yet decided whether a showing of these factors [i.e., reliance or prejudice] is ever necessary for a plaintiff to succeed in an action brought under ERISA." *Id.* at 1213. The Fifth Circuit has also avoided answering the question. *See Rhorer v. Raytheon Engineers and Constructors, Inc.*, 181 F.3d 634, 644 n.12 (5th Cir. 1999) ("This Court has never held that an ERISA claimant must prove reliance on a summary plan description in order to prevail on a claim to recover benefits," and also explaining that precedent had acknowledged the reliance issue but had not resolved whether reliance is a necessary element).

Upon consideration of the "reliance" issue, we now hold that a plan participant who bases a claim for plan benefits on a conflict between an SPD and plan document need neither plead nor prove reliance on the SPD.

Claims for ERISA plan benefits under ERISA § 502(a)(1)(B) are contractual in nature. *Cf. Feifer*, 306 F.3d at 1210 ("A claim under § 1132(a)(1)(B), 'in essence, is the assertion of a contractual right.' . . . In interpreting plan terms for purposes of claims under § 1132(a)(1)(B), we apply a federal common law of contract, informed both by general principles of contract law and by ERISA's purposes as manifested in its specific provisions.") (quoting *Strom v. Goldman, Sachs & Co.*, 202 F.3d 138, 142 (2d Cir. 1999)).

Our determination that a SPD controls over the plan document where the two conflict does not change the contractual character of these claims. Instead, our holding recognizes that because Congress requires that an SPD be "sufficiently accurate and comprehensive to reasonably

apprise . . . participants . . . of their rights and obligations," 29 U.S.C. § 1022(a), the SPD serves as a summary of the contract's (i.e., the plan document's) key terms. If an SPD conflicts with a plan document, then a court should read the terms of the "contract" to include the terms of a plan document, as superseded and modified by conflicting language in the SPD. And, just as a court's enforcement of a contract generally does not require proof that the parties to the contract actually read, and therefore relied upon, the particular terms of the contract, we are persuaded that enforcement of an SPD's terms under a claim for plan benefits *does not* require a showing of reliance.[21] As the Second Circuit has explained,

> [W]e are unaware of caselaw to the effect that a plaintiff must show reliance or prejudice to enforce terms of a plan. Such a limitation on the reliance or prejudice requirement is consistent with the principle that an action under ERISA to enforce plan terms sounds in contract, and a plaintiff generally need not show equitable factors such as reliance or prejudice to enforce contractual terms.

*Feifer*, 306 F.3d at 1202.[22] Based upon our view of Congress's intent, an SPD furnishes the plan's terms to the extent that it conflicts with (and thus supersedes) the language of a formal plan document. We thus hold that, in enforcing an SPD's terms, a participant does not need to plead reliance or prejudice, since the claim for plan benefits under ERISA § 502(a)(1)(B) is contractual.

Accordingly, in light of our conclusion that a summary plan description controls over a plan document where the two conflict, and thus serves as a source for benefits due

---

21. Indeed, as the Second Circuit has noted, "those courts that have imposed requirements such as reliance or prejudice did so only where plaintiffs sought to enforce provisions other than those that the court deemed 'plan' terms." *Feifer*, 306 F.3d at 1213 (citing, *inter alia*, *Gridley*).

22. In *Feifer*, the Second Circuit did not deal with an SPD that conflicted with a formal plan document; rather, it treated the relevant summary documents in the case before it as constituting the plan. *See Feifer*, 306 F.3d at 1202 ("the Program Summary (with the accompanying memorandum) *was* the plan") (emphasis in original).

under an ERISA plan, we hold that Burstein has stated a claim against the Plan itself for plan benefits and thus against the PBGC as administrator.[23]

### D.

We reach a different conclusion as to claims against the PBGC in its role as *guarantor*. As the district court concluded, *see Burstein*, ___ F. Supp. 2d ___, 2002 WL 31319407, at *9, the statute governing the PBGC's guarantee of benefits does not require PBGC to guarantee the benefits at issue here.

The Supreme Court has outlined the limited role of the PBGC as guarantor:

> When a plan covered under Title IV terminates with insufficient assets to satisfy its pension obligations to the employees, the PBGC becomes trustee of the plan, taking over the plan's assets and liabilities. The PBGC then uses the plan's assets to cover what it can of the benefit obligations. . . . The PBGC then must add its own funds to ensure payment of *most of the remaining "nonforfeitable" benefits*, i.e., those benefits to which participants have earned entitlement under the plan terms *as of the date of termination. ERISA does place limits on the benefits PBGC may guarantee upon plan termination, however, even if an employee is entitled to greater benefits under the terms of the plan. . . .* Finally, active plan participants (current employees) cease to earn additional benefits under the plan upon its termination and *lose entitlement to most benefits not yet fully earned as of the date of plan termination.*

---

23. Because Kasperbauer ceased to be the administrator of the Plan once the Plan was terminated, the PBGC was obliged to take over the administration of the Plan. To the extent that the PBGC took the place of the Plan administrator, Burstein, if he was to prove that benefits are due him under the language of the SPD, could seek to enforce his claim for benefits against the Plan, with PBGC as its administrator. In such a case, PBGC, as Plan administrator, would allocate funds from Plan assets pursuant to the asset allocation priorities contained in 29 U.S.C. § 1344.

*Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 637-38 (1990) (emphasis added) (citations omitted).

The statutory provision covering the single-employer plan guarantee, 29 U.S.C. § 1322, provides as follows:

> Subject to the limitations contained in subsection (b) of this section, the [PBGC] shall guarantee, in accordance with this section, the payment of all nonforfeitable benefits *(other than benefits becoming nonforfeitable solely on account of the termination of a plan)* under a single-employer plan which terminates at a time when this subchapter applies to it.

29 U.S.C. § 1322(a) (emphasis added).

The bold text above, which qualifies the statutory guarantee requirement, is directly applicable to this situation. PBGC's obligation to guarantee certain benefits *does not apply* to benefits that have become nonforfeitable *solely* on account of the termination of the plan.[24] The benefits claimed by Burstein, even if due under the Plan by virtue of the SPD's language, would have become "nonforfeitable" (vested) *solely due to the plan's partial termination. See* SPD at 25, A219 ("If the Plan is terminated you will automatically become vested in your account, regardless of how many years of service you have earned.") (emphasis added).[25]

Under the plain terms of 29 U.S.C. § 1322(a), the PBGC, in its guaranty role, is not responsible for guaranteeing or insuring plan benefits that become vested solely as a result of a plan termination. We hold that here, where the complaint may be read only to allege that the claimed benefits vested as a result of the *partial* termination, § 1322(a)'s exception for benefits that "become nonforfeitable solely on account of the termination of a

---

24. A "nonforfeitable benefit" means "a benefit for which a participant has satisfied the conditions for entitlement under the plan or the requirements of this chapter." 29 U.S.C. § 1301(a)(8). *See also Mead Corp. v. Tilley*, 490 U.S. 714, 717 n.1 (1989) (quoting same).

25. As we explained *supra*, the SPD's language relating to "termination" encompasses "partial termination" for the purpose of examining whether benefits were due under the Plan.

plan" applies with equal force to benefits that have become nonforfeitable solely on account of a *partial termination* of a plan that is later terminated.

We therefore conclude that Burstein has failed to state a claim against the PBGC, *in its role as guarantor*. Section 1322(a) precludes the federal courts from ordering as relief to Burstein the payment of these benefits out of PBGC's own guarantee funds. Accordingly, we will affirm the district court's dismissal of claims against PBGC as guarantor.

## IV.

Burstein also seeks relief under an equitable estoppel theory against Kasperbauer, McConnell, and the AHERF trustees. This claim arises under Count VI, which we have characterized as Category Two. We have held that to state a cause of action for equitable estoppel under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), an "ERISA plaintiff must establish (1) a material representation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances." *Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 235 (3d Cir. 1994).

First and foremost, Burstein has alleged no extraordinary circumstances. We have held that " 'extraordinary circumstances' generally involve acts of bad faith on the part of the employer, attempts to actively conceal a significant change in the plan, or commission of fraud." *Jordan v. Federal Express Corp.*, 116 F.3d 1005, 1011 (3d Cir. 1997). None has been alleged here. Furthermore, "we have consistently rejected estoppel claims based on simple ERISA reporting errors or disclosure violations, *such as a variation between a plan summary and the plan itself*, or an omission in the disclosure documents." *Kurz v. Philadelphia Elec. Co.*, 96 F.3d 1544, 1553 (3d Cir. 1996) (emphasis added).

Moreover, we are aware that the district court held that equitable estoppel claims could not run in any event against Kasperbauer, McConnell, or the AHERF Trustees, because these defendants have no power over, or present relationship to, the Plan. Hence, Burstein had no claim

against them under an equitable estoppel theory, which sought to estop them from enforcing the Plan in any manner other than in accordance with the SPD. Additionally, Burstein did not argue on appeal that equitable estoppel applied to the PBGC. We hold that the district court did not err in dismissing Burstein's equitable estoppel claims.

## V.

We will affirm the district court's dismissal of all but one of the claims for breach of fiduciary duty. Counts I-V of the complaint, which we have characterized as Category Three, deal with alleged breaches of fiduciary duty.

ERISA sets out certain obligations for fiduciaries.[26] Under ERISA § 502(a)(3)(B), 29 U.S.C. § 1132(a)(3)(B), a plan participant may have a cause of action for a breach of fiduciary duty.[27] To allege and prove a breach of fiduciary duty for misrepresentations,

---

26. Under ERISA, a fiduciary:

   shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

   (A) for the exclusive purpose of:

   (I) providing benefits to participants and their beneficiaries; and

   (ii) defraying reasonable expenses of administering the plan;

   (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; . . .

   (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

29 U.S.C. § 1104(a).

27. Section 502(a)(3) of ERISA provides that a plan participant may bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief." 29 U.S.C. § 1132(a)(3).

> a plaintiff must establish each of the following elements: (1) the defendant's status as an ERISA fiduciary acting as a fiduciary; (2) a misrepresentation on the part of the defendant; (3) the materiality of that misrepresentation; and (4) detrimental reliance by the plaintiff on the misrepresentation.

*Daniels v. Thomas & Betts Corp.*, 263 F.3d 66, 73 (3d Cir. 2001). We evaluate the dismissal of the breach of fiduciary duty claims with this framework in mind.

## A.

The district court rejected all of Burstein's breach of fiduciary duty claims, holding that Burstein failed to state a claim. We agree with the district court as to all but one of the breach of fiduciary duty claims.

"ERISA . . . defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan." *Mertens v. Hewitt Associates*, 508 U.S. 248, 262 (1993). As the district court properly noted, "[f]iduciary duties 'attach not just to particular persons, but to particular persons performing particular functions.' " *Burstein*, ___ F. Supp. 2d ___, 2002 WL 31319407, at *15 (quoting *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1158 (3d Cir. 1990)). "[U]nder ERISA, a person 'is a fiduciary with respect to a plan' only 'to the extent' that 'he has any discretionary authority or discretionary responsibility in the administration of such plan.' " *Varity Corp.*, 516 U.S. at 527 (quoting 29 U.S.C. § 1002(21)(A)(iii)); *see also Confer v. Custom Eng'g Co.*, 952 F.2d 34, 36 (3d Cir. 1991) ("In determining who is a fiduciary under ERISA, courts consider whether a party has exercised discretionary authority or control over a plan's management, assets, or administration.").

The district court dismissed Counts II through V, inclusive, and Count I as to all named defendants but Kasperbauer, based on its analysis of those defendants' functions with respect to the Plan. Count I, against Kasperbauer, McConnell, and the AHERF Trustees, was for misrepresentations based on the SPD, Plan Brochure, and verbal representations. Count II, against Kasperbauer,

McConnell, the AHERF Trustees, and Mellon Bank, was for "failure to disclose material information." Counts III-V alleged "mismanagement of plan assets."[28]

After an independent and careful review of the record, we are satisfied that the district court's analysis respecting all of Burstein's claims against Kasperbauer, McConnell, the AHERF Trustees,[29] and Mellon Bank, except for Count I as to Kasperbauer, was correct. The district court properly dismissed these claims either because the defendants other than Kasperbauer did not hold fiduciary positions that could render them liable, or because the assets alleged to be Plan assets were not Plan assets. Except for the claims that Burstein has alleged against Kasperbauer and that pertain to Kasperbauer's fiduciary responsibilities, we have considered Burstein's "breach of fiduciary duty" arguments on appeal against the other defendants and conclude that they are without merit. We also conclude that Burstein's claims against Kasperbauer, other than the claims in Count I (misrepresentation), were properly dismissed by the district court.

## B.

With respect to Count I ("Claim . . . for Breach of Fiduciary Duties — Misrepresentation"), the district court stated that Kasperbauer, as Plan administrator, "was clearly a fiduciary . . . for purposes of . . . communicating with plan participants." *Burstein*, ___ F. Supp. 2d ___, 2002 WL 31319407, at *16. Kasperbauer does not dispute his fiduciary status for these purposes.

In analyzing whether Burstein had stated a claim against

---

28. Count III named Kasperbauer, McConnell, and the AHERF Trustees as defendants. Count IV named Mellon Bank. Count V named particular AHERF Trustees: Cahouet, Barnes, Gumberg, Adam, and Fletcher.

29. As we have stated, the AHERF Trustees named in the complaint are William F. Adam, J. David Barnes, Ralph W. Brenner, Dorothy McKenna Brown, Frank V. Cahouet, Douglas D. Danforth, Ronald R. Davenport, Harry R. Edelman, III, Robert L. Fletcher, Ira J. Gumberg, Robert M. Hernandez, Francis B. Nimick, Robert B. Palmer, David W. Sculley, and W.P. Snyder, III. *See* note 4, *supra*.

Kasperbauer, the district court looked to our decision in *In re Unisys Corp. Retiree Medical Ben. ERISA Litigation* (*Unisys II*), 57 F.3d 1255 (3d Cir. 1995), *cert. denied*, 517 U.S. 1103 (1996), in which we described the elements of an ERISA breach of fiduciary duty claim as "proof of fiduciary status, misrepresentations, company knowledge of the confusion and resulting harm to the employees." *Id.* at 1265.

As noted above, the district court determined that the "proof of fiduciary status" element had been met. The district court also held, and Kasperbauer does not challenge on appeal, that statements in the SPD and Plan Brochure could be misleading, thus meeting the "misrepresentation" element.[30]

---

30. The district court stated:

> With regard to the content of the SPD, the court *cannot say as a matter of law* that the *statement that participants would vest in their accounts upon termination regardless of how many years of service they had completed, without advising participants that they only received a vested right to those accounts to the extent funded*, is not a "material misrepresentation" or "incomplete, inconsistent, or contradictory disclosure." A factfinder could reasonably conclude based on the unqualified statement in the SPD that *participants who had not otherwise vested could reasonably expect to receive the value of their account upon termination, regardless of whether the Plan was adequately funded.* . . . Further, in light of the conclusion that the disclosures in the SPD may qualify as incomplete disclosures, the court cannot say as a matter of law that the lack of information regarding Plan termination in the Plan Brochure was not also a material omission. . . .
>
> We reach the same conclusion with regard to statements in the SPD and the [Plan] Brochure that plaintiffs claim led them to believe that they *had individual accounts and a nonforfeitable right to the funds in those accounts.* Although the SPD unambiguously explained that the accounts were only hypothetical and that participants' benefits were pooled in a single trust account, the Plan Brochure did not contain such an explanation and describes participants' interests in the Plan as individual "accounts" which they "own."

*Burstein*, ___ F. Supp. 2d ___, 2002 WL 31319407, at *17-*18 (emphasis added) (citations omitted).

In addition, the district court determined that "the allegations in Count I and throughout the rest of the proposed Second Amended Complaint, if true, can reasonably support an inference that Kasperbauer was aware of Plan participants' misunderstanding as to the scope of their rights to retirement benefits upon termination." *Burstein*, ___ F. Supp. 2d ___, 2002 WL 31319407, at \*18. For this reason, the district court stated that the "Second Amended Complaint adequately alleges that Kasperbauer knew of the confusion created." *Id.* Kasperbauer does not challenge this conclusion on appeal.[31]

The district court concluded, however, that the fourth element of an ERISA breach of fiduciary duty claim — which it termed "causation" or "resulting harm," based on its use of *Unisys II* as the guiding precedent — had not been met. The district court explained that "in the context of a breach of fiduciary duty claim premised on a misrepresentation or omission, it is difficult to conceive of any type of causation other than some kind of detrimental reliance by the plan beneficiary." *Burstein*, ___ F. Supp. 2d ___, 2002 WL 31319407, at \*19. The district court also cited our cases that identified detrimental reliance as an element of a breach of fiduciary duty claim based upon a misrepresentation. *See id.* (citing, *inter alia*, *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 492 (3d Cir. 2000); *In re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation*

---

31. In *Daniels*, we did not identify "knowledge of the confusion" as an element of a breach of fiduciary duty claim. *See Daniels*, 263 F.3d at 73. Instead, we identified the third element as the "materiality" of the misrepresentation. *Id.* Our formulation in *Adams v. Freedom Forge Corp.*, 204 F.3d 475 (3d Cir. 2000), combines these ideas by requiring that, to state a claim for breach of fiduciary duty, the fiduciary, among other things, must have "made a material misrepresentation that would confuse a reasonable beneficiary about his or her benefits." *Id.* at 492. Though the *Adams* court did not use the word "knowledge," the requirement that a misrepresentation must "confuse a reasonable beneficiary" suggests that a fiduciary, as an objective matter, knew or should have known that a beneficiary would be confused. Because Kasperbauer has conceded this element, at least for purposes of the motion to dismiss, we need not parse out precisely what role "knowledge" has in stating a claim for breach of fiduciary duty.

*(Unisys III)*, 242 F.3d 497, 507-09 (3d Cir.), *cert. denied*, 534 U.S. 1018 (2001)).

The district court held that Burstein had failed to plead reliance; rather, he had alleged only the mere "*expectation* that benefits would materialize," without alleging "reliance on that expectation." *Id.* (emphasis in original). The court found "telling" that, in its view, Burstein had failed to cite an action taken in reliance on this expectation by the time of his Second Amended pleading. *Id.* at *20.

On appeal, Burstein argues that the district court's reading of our precedent to require pleading of detrimental reliance constituted error. Pointing to the "resultant harm" language from *Unisys II*, Burstein claims that detrimental reliance is one of many ways to show "resultant harm." *Unisys II*, 57 F.3d at 1265. This view, however, does not comport with our explicit identification in *Daniels* of detrimental reliance as a necessary element of a breach of fiduciary duty claim based on misrepresentation. *See Daniels*, 263 F.3d at 73. As we have recited, in order to state a claim for misrepresentation by an ERISA fiduciary, Burstein must allege the four elements found in *Daniels*: (1) that Kasperbauer was acting as a fiduciary; (2) that Kasperbauer made misrepresentations; (3) that the misrepresentations are material; and (4) that *Burstein relied on the misrepresentations to his detriment. Id.* Even in cases prior to *Daniels*, we had also explained that detrimental reliance is an element of an ERISA breach of fiduciary claim. *See Adams*, 204 F.3d at 492 (3d Cir. 2000) ("An employee may recover for a breach of fiduciary duty if he or she proves that an employer, acting as a fiduciary, made a material misrepresentation that would confuse a reasonable beneficiary about his or her benefits, and the *beneficiary acted thereupon to his or her detriment.*") (emphasis added) (citing *Unisys II*); *see also Unisys III*, 242 F.3d 497, 505 (3d Cir. 2001) (quoting *Adams*).

Our jurisprudence therefore requires "detrimental reliance" as an element of a breach of fiduciary duty claim. *See Daniels*; *Adams*; *Unisys III*. Burstein argues that "[i]n some cases, causation may be established based upon the employee's *expectancy interest* in the misrepresented benefits." Burstein Reply Br. at 10-11 (emphasis added)

(citing *Unisys III*, 242 F.3d at 506 n.7). The footnote to which Burstein points in *Unisys III*, 242 F.3d at 506 n.7, however, does not refer to an "expectancy interest" as an element of an ERISA breach of fiduciary duty, but rather to the character of potential ERISA remedies. Indeed, the very next footnote in *Unisys III*, *id.* at 506 n.8, reiterates that "detrimental reliance is a necessary element of a breach of fiduciary duty of this kind," i.e., involving misrepresentations.

As counsel for Burstein conceded at oral argument, the proposed Second Amended Complaint cannot be read to plead detrimental reliance. In answer to our questions at oral argument, however, counsel represented to us that, if Burstein was given yet another opportunity to plead reliance, he could do so.

During counsel's opening argument, counsel stated that the element of detrimental reliance had been pled in the proposed Second Amended Complaint. *See* Tr. of Oral Arg. at 23 ("It's in our proposed Second Amend[ed] Complaint. That's absolutely in our proposed Second Amended Complaint."). After reviewing the complaint, however, the following colloquy between the Court and counsel occurred during counsel's rebuttal argument:

> THE COURT: Mr. Eisenhofer. Were you able to find the provisions [concerning detrimental reliance]?

> MR. EISENHOFER: I'll tell you, what I found was, I found a way in which we pled the element of resulting harm, because that is what we understood from this Court's opinions were the elements of the breach of fiduciary duty claim, and one of the ways to show resulting harm was through detrimental reliance.

> THE COURT: Did you plead detrimental reliance?

> MR. EISENHOFER: We did not plead specifically that the receipt of less compensation and benefits for being employed at AHERF when they were led to believe that they would receive it[; we] did not say that that constitutes detrimental reliance. We did plead the loss of expectancy in the compensation of benefits. That's what I recall.

Tr. of Oral Arg. at 57-58.

The Court questioned counsel further on the choice not to plead detrimental reliance:

> THE COURT: Isn't that a different animal?

> MR. EISENHOFER: I don't believe so, your Honor. I believe that the element of breach of fiduciary duty is the resulting harm, and one of the ways in which this Court has said you can show resulting harm is detrimental reliance. Another way in which you can show resulting harm is to receive something less than what you have been led to believe you would.

> THE COURT: Well, your opponent said it was a deliberate decision on your part, because you feared problems with a possible class certification motion later on.

> MR. EISENHOFER: They may be giving me a little bit more credit than I deserve, your Honor.

Tr. of Oral Arg. at 58-59.

Counsel then sought to argue that (contrary to what we have held, *supra*) detrimental reliance is not a necessary element of a breach of fiduciary duty. The Court then asked whether, if it were to disagree, Burstein would be able to plead detrimental reliance:

> THE COURT: Let's assume for the moment that we don't agree with you on that, and the question then becomes, can you, in good faith, state that these plaintiffs relied on the Summary Plan Description by some action that they took, and that as a result of that reliance, they were thereafter harmed?

> MR. EISENHOFER: I believe so, your Honor. I mean, I think that the element that has been —

> THE COURT: There has to be more than just beliefs, though, because what you're asking us to do is to reverse [the District Court,] send it back for a Third Amended Complaint so that you can state precisely what Judge Ambro has informed you must be stated. And there's no point in our sending it back and holding

that he abused his discretion . . . if indeed, you don't know that you can do that. . . .

MR. EISENHOFER: Your Honor, as I said, I believe that we can do that as to these plaintiffs. I think that the element that has been missing . . . from the argument, because I don't know that is dispositive . . . is that the misstatements in the Summary Plan Description were not the only misstatements. . . . [T]here was a whole other brochure which created a whole host of different misunderstandings on the part of these persons which are all part of the mix.

THE COURT: . . . The question in my mind is, how do . . . we then turn around and say . . . to the District Court judge who has assembled in his mind [the defendants'] arguments and yours and who said plaintiffs still didn't do this [i.e., plead detrimental reliance]? How do we tell him that he abused his discretion?

MR. EISENHOFER: Your Honor, what I would suggest is that we thought that we pled the element of harm. . . .

Our position had been that detrimental reliance is not the sole way in which you can show causation, but having an expectancy in these benefits is implicitly relying upon their existence.

To the extent that this Court disagrees with our argument on the expectancy and the implicit nature of the reliance in having that expectancy, I would ask for leave to replead to meet that standard, but . . . I'm hopeful that the Court not eliminate the expectancy at the motion to dismiss stage as a possible way of showing harm . . .

Tr. of Oral Arg. at 62-66.

It is our understanding, therefore, that Mr. Eisenhofer, counsel for Burstein, has represented to this Court that Burstein can and will plead the element of detrimental reliance in alleging the breach of fiduciary duty by Kasperbauer. We emphasize that it is on the basis of Mr. Eisenhofer's representation that we will direct the district

court to permit Burstein to file a Third — *and final* — Amended Complaint so that Burstein, if he can, may plead detrimental reliance on the Summary Plan Description.[32]

To simplify the morass which may have been created by our permitting the Second Amended Complaint to be filed, even though we have affirmed the district court's dismissal of many of its counts and defendants, our direction that the district court permit a Third and final Amended Complaint to be filed should be read as requiring the following:

1. Burstein, in conformance with this opinion, is to eliminate and delete all but the actionable claims against those defendants who we have held may be liable. This means that where the district court has dismissed particular defendants, and we have affirmed those dismissals, Burstein may not allege the same claims against them.

2. Thus, where we have affirmed the district court's dismissal of Count VI, Burstein may not reallege those claims.

3. Where Burstein's counsel has represented to us that detrimental reliance can be pled in his cause of action asserted against Kasperbauer for breach of fiduciary duty, he may do so if indeed there has been detrimental reliance. If he cannot plead such reliance, then his complaint must delete the claim for breach of fiduciary duty.

Thus, the remaining viable portions of the Second Amended Complaint (which had not been filed) may now be transferred to Burstein's Third and final Amended Complaint, and the district court, after such filing, may again exercise its discretion in reviewing the Third Amended Complaint.

---

32. We do so particularly since we are reversing and remanding to the district court in any event. Thus, in so instructing the district court, we emphasize that we do not fault the district court for denying Burstein's motion for leave to file the proposed Second Amended Complaint. Under the district court's reading of *Gridley*, the district court could well have considered filing a new complaint to be futile.

## VI.

We summarize our holdings in this case.

Because we hold that a plan beneficiary may state a claim for plan benefits based on a conflict between a summary plan description and a plan document, we will reverse the dismissal of the claim for plan benefits pursuant to 29 U.S.C. § 1132(a)(1)(B) (Counts VII and VIII) only as against the Plan itself, and the PBGC as administrator of the Plan, and will affirm the dismissal of all other defendants.

Because 29 U.S.C. § 1322(a) specifically limits the responsibility of the PBGC to guarantee plan benefits and excludes from that guarantee those benefits that — as in this case — have become nonforfeitable "solely" as a result of the Plan's partial termination, we will affirm the dismissal of the claim for plan benefits against the PBGC in its role as *guarantor*. (Counts IX-X).

We will affirm the dismissal of the equitable estoppel claim (Count VI) against all defendants because the relief Burstein seeks with respect to the equitable estoppel claim is no longer viable (as injunctive relief is unavailable) and because extraordinary circumstances were not pled.

We will affirm the dismissal of all defendants but Kasperbauer on the breach of fiduciary duty claims (Count I, except as to Kasperbauer, and Counts II through V, inclusive). We will reverse the district court's dismissal of the claim for breach of fiduciary duty against Kasperbauer (Count I as to Kasperbauer), as Kasperbauer was the only plan fiduciary with responsibilities related to the Summary Plan Description.

Based upon the representation that counsel for Burstein made to this Court, we will direct the district court, on remand, to permit Burstein to file a final, Third Amended Complaint as described above.

Given our disposition of these claims, we will also reverse the denial of the motion for class certification as moot. We express no opinion as to whether a class should be

certified, and instead leave that determination to the district court's discretion in the first instance.[33]

Thus, we will AFFIRM IN PART and will REVERSE IN PART the judgment of the district court, and will REMAND for further proceedings consistent with this opinion.

A True Copy:
        Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*

---

33. The district court is free, in its full discretion, to hold hearings if deemed necessary or to take other actions deemed appropriate based on the remaining issues before it.